**The AUSTIN COMPANY**

**v.**

**The UNITED STATES.**

**No. 177–61.**

United States Court of Claims.
March 6, 1963.

Leward C. Wykoff, Cleveland, Ohio, for plaintiff. Thomas V. Koykka, Edward C. Adkins and Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, were on the briefs.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Acting Asst. Atty. Gen. Joseph D. Guilfoyle, for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

LARAMORE, Judge.

This case is being heard on plaintiff's motion and defendant's cross-motion for summary judgment, and involves interpretation of a contract which plaintiff says was later found to be impossible of performance.

The Austin Company, plaintiff, entered into a contract with the United States on August 11, 1954, to design, manufacture, test and deliver a Digital Data Recording and Transcribing System, for the contract price of $177,500. This was to be a system, incorporating the use of a servo-mechanism, to gather data from remote locations aboard a ship, amplify the information so gathered, and transmit it to a central point where it was to be converted to digital form suitable for use in a computer and finally recorded on magnetic tape. No system of this kind had ever been previously manufactured or developed.

Before execution of the contract, the plaintiff reviewed the defendant's specifications and determined that the system as so described could not be manufactured with the required precision set forth in the specifications because of the

inherent time lag involved in the operation of the servo-mechanism. The plaintiff then studied the problem, and on June 1, 1954 submitted a technical proposal embodying modifications of the defendant's specifications, including an implementation designed to compensate for the characteristic error of the servo-mechanism. The plaintiff's proposal also contemplated a system having greater accuracy than that outlined in the defendant's specifications. After conferring with the defendant's representatives, the plaintiff further supplemented and revised its proposal. Both the defendant and the plaintiff believed the plaintiff's proposal sound and workable and would result in a more precise system. Therefore, the plaintiff's proposal was incorporated into the specifications of the contract which was then signed on August 11, 1954.

The plaintiff diligently proceeded to attempt to develop and manufacture the contracted-for system, and incurred expenditures of $290,000 to this end. However, due to a phenomenon called "jitter", which is noise of electrical or mechanical origin caused by vibrations and other disturbances, and which sometimes occurs in highly sensitive electronic systems, it was discovered that it was impossible for plaintiff to manufacture the called-for system, as specified, with the desired precision. After granting plaintiff several extensions of time to produce the system, the defendant finally terminated the contract when it became apparent that plaintiff could not make the system as required.

The main question before the court is whether, under the termination provisions of the contract, the plaintiff is entitled to recover the expenditures, not in excess of the contract price, which it incurred in its effort to manufacture the contracted-for system. Plaintiff's primary claim is that it is entitled to recover such expenditures because its nonperformance was, in the words of the contract, "due to causes beyond the control and without the fault or negligence of the Contractor."

The aforementioned clause is further implemented by another provision of the contract, which reads as follows:

"(b) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes * * *."

Other termination provisions of the contract provide that when the contractor's failure to perform is due to causes beyond the control of the contractor, as determined in the above-quoted provision, the contract shall be considered terminated for the convenience of the Government and the contractor may recover its costs, not in excess of the contract price, incurred while attempting to perform.

• The facts here indicate that plaintiff's failure to perform was solely due to the fact that it was impossible for it to manufacture a workable system as set forth in the specifications, which were the plaintiff's own design. However, the Government strongly urges that the system proposed in the contract was not impossible of being developed. Whether it was or was not, we do not know. All we do know is that plaintiff could not develop the system according to its plans. This, however, is not to say that the proposed system was impossible of manufacture. It certainly was foreseeable. For example, in the not too distant past, while perhaps foreseeable, no organization would have thought possible, or undertaken a contract to construct a device whereby a living human body could be put in orbit around the earth; nevertheless it has been accomplished. Thus, in this case, we cannot categorically say that it was or is impossible to achieve the goal called for in plaintiff's contract.

Notwithstanding this, because plaintiff could not develop the system as planned, it claims that its failure to perform was due to causes beyond its control and thus is excused under the exculpatory provisions of the contract.

■ The defendant disputes plaintiff's claim that its failure of performance was covered by the exculpatory termination clause in the contract. Defendant contends that the clause in question was limited to excuse of nonperformance solely due to occurrence of extraneous contingencies of the kind specifically enumerated thereunder. Defendant cites the rule of *ejusdem generis*, i. e., general words in a contract are limited by particular words to things of the same *kind or class*, to support its contention that the words "causes beyond the control" refer solely to extraneous factors which might prevent performance, because only these kind of factors were enumerated in explanation of the causes to be considered.

■ We agree with the defendant that the rule of *ejusdem generis* is applicable to interpretation of the nonperformance clause in this contract, and operates to restrict the clause to exculpation of nonperformance due to the kind or class of extraneous contingencies enumerated therein, i. e.: acts of God. etc. As we view the issue, if the plaintiff's failure of performance was due to the absolute impossibility of performance inherent in the subject matter of the contract itself, and which impossibility already existed at the time the contract was entered into, plaintiff's failure would not be excused under the exculpatory clause of the contract. See Carnegie Steel Company v. United States, 240 U.S. 156, 36 S.Ct. 342, 60 L.Ed. 576.

■ Furthermore, on an overall view of the facts of this case, we think that plaintiff is not entitled to recover. Plaintiff was not under any compulsion to enter into the contract. However, before it did so contract, it studied the specifications prepared by the defendant and decided they were unworkable. It then proposed changes in the specifications and, after further study, revised its proposed changes and assured the defendant that a contract based thereon would be performed and additionally would result in a system of greater precision than that orginally required by the defendant. When the formal contract was executed by the parties on August 11, 1954, it incorporated the pertinent aspects of plaintiff's proposal and deleted the conflicting aspects in the original specifications.

Thus, while free to refrain from contracting, plaintiff came forward with its own design which was integrated into the contract. From the above, it is readily apparent that plaintiff believed it could not perform under the Government's specifications. However, it not only believed possible, but *promised* to perform under its own substituted specifications. Under these circumstances, we are faced with the fact that plaintiff had full knowledge of the perils of performance and entered into the contract with its eyes open. This, in our opinion, would indicate that plaintiff fully assumed the risks of impossibility of performance. It also underscores our earlier conclusion regarding the nonperformance clause of the contract, in that had the parties intended to shift the risk of impossibility of perfecting the system from the plaintiff to the defendant, they doubtlessly would not have relied on such an inappropriately worded clause referring only to extraneous contingencies.

In addition, this court has always held that the Government is responsible for its own specifications and, if for any reason, plaintiff had been hindered in performance or suffered losses by reason thereof, due to defective specifications, the Government is liable for such losses. See Helene Curtis Industries, Inc. v. United States, Ct.Cl., 312 F.2d 774, and cases cited therein. We can think of no reason why the converse of this should not apply to plaintiff.

In other words, plaintiff drew up the specifications and thereby undertook a firm obligation to perform thereunder. In this climate plaintiff must turn the same square corners as required of the

Government and is bound by specifications of its own making.

If the plaintiff, under the facts and circumstances above outlined, were permitted to recover, it would be to say that a contractor assumes nothing upon signing a contract. It would permit a contractor to gamble on a contract of this nature and force the Government to pay the expense of its gamble. Under most circumstances contractors expend money, sometimes in great amounts, in preparation of a bid and then in preparation for performance. They take a risk and are bound by the assumption thereof, unless the contract specifically provides otherwise.

For the above reasons, plaintiff's motion for summary judgment is denied, and defendant's cross-motion is granted. Plaintiff's petition is dismissed.