**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**WEGEMATIC CORPORATION,**
**Defendant-Appellant.**

**No. 225, Docket 29855.**

United States Court of Appeals
Second Circuit.

Argued March 28, 1966.

Decided May 5, 1966.

John L. Goldstone, New York City (Leon, Weill & Mahony, New York City), for defendant-appellant.

Arthur S. Olick, New York City (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, Alvin H. Meadow, Asst. U. S. Atty., of counsel), for plaintiff-appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

The facts developed at trial in the District Court for the Southern District of New York, fully set forth in a memorandum by Judge Graven, can be briefly summarized: In June 1956 the Federal Reserve Board invited five electronics manufacturers to submit proposals for an intermediate-type, general-purpose electronic digital computing system or systems; the invitation stressed the importance of early delivery as a consideration in determining the Board's choice. Defendant, a relative newcomer in the field, which had enjoyed considerable success with a smaller computer known as the ALWAC III–E, submitted a detailed proposal for the sale or lease of a new computer designated as the ALWAC 800. It

characterized the machine as "a truly revolutionary system utilizing all of the latest technical advances," and featured that "maintenance problems are minimized by the use of highly reliable magnetic cores for not only the high speed memory but also logical elements and registers." Delivery was offered nine months from the date the contract or purchase order was received. In September the Board acted favorably on the defendant's proposal, ordering components of the ALWAC 800 with an aggregate cost of $231,800. Delivery was to be made on June 30, 1957, with liquidated damages of $100 per day for delay. The order also provided that in the event the defendant failed to comply "with any provision" of the agreement, "the Board may procure the services described in the contract from other sources and hold the Contractor responsible for any excess cost occasioned thereby." Defendant accepted the order with enthusiasm.

The first storm warning was a suggestion by the defendant in March 1957 that the delivery date be postponed. In April it informed the Board by letter that delivery would be made on or before October 30 rather than as agreed, the delay being due to the necessity of "a redesign which we feel has greatly improved this equipment"; waiver of the stipulated damages for delay was requested. The Board took the request under advisement. On August 30 defendant wrote that delivery would be delayed "possibly into 1959"; it suggested use of ALWAC III–E equipment in the interim and waiver of the $100 per day "penalty." The Board also took this request under advisement but made clear it was waiving no rights. In mid-October defendant announced that "due to engineering difficulties it has become impracticable to deliver the ALWAC 800 Computing System at this time"; it requested cancellation of the contract without damages. The Board set about procuring comparable equipment from another manufacturer; on October 6, 1958, International Business Machines Corporation delivered an IBM 650 computer, serving substantially the same purpose as the ALWAC 800, at a rental of $102,000 a year with an option to purchase for $410,450.

In July 1958 the Board advised defendant of its intention to press its claim for damages; this suit followed. The court awarded the United States $46,300 for delay under the liquidated damages clause, $179,450 for the excess cost of the IBM equipment, and $10,056 for preparatory expenses useless in operating the IBM system—a total of $235,806, with 6% interest from October 6, 1958.

The principal point of the defense, which is the sole gound of this appeal, is that delivery was made impossible by "basic engineering difficulties" whose correction would have taken between one and two years and would have cost a million to a million and a half dollars, with success likely but not certain. Although the record does not give an entirely clear notion what the difficulties were, two experts suggested that they may have stemmed from the magnetic cores, used instead of transistors to achieve a solid state machine, which did not have sufficient uniformity at this stage of their development. Defendant contends that under federal law, which both parties concede to govern, see Cargill, Inc. v. Commodity Credit Corp., 275 F.2d 745, 751–753 (2 Cir. 1960), the "practical impossibility" of completing the contract excused its defaults in performance.

We agree with the defendant that the decisions most strongly relied on by the Government are not controlling; much of the seeming confusion in this field of law stems from failure to make necessary distinctions as to who is suing whom for what. Thus Day v. United States, 245 U.S. 159, 38 S.Ct. 57, 62 L.Ed. 219 (1917), and Fritz-Rumer-Cooke Co. v. United States, 279 F.2d 200, 6 Cir. (1960), involved no question of nonperformance but an attempt by a contractor who had fully performed to secure added compensation for surmounting unexpected difficulties. While Austin Co. v. United States, 314 F.2d 518, 161 Ct.Cl. 76, cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963), did involve failure

by a manufacturer to perform because of engineering problems, it was not an effort to resist damages, which the Government did not seek; the contractor was attempting to recover costs incurred prior to termination under a special clause in the contract without which, as Professor Corbin has noted, it "would not have had the shadow of a claim." 6 Corbin, Contracts § 1328 n. 40 (1964 Pocket Part). Consolidated Airborne Systems, Inc. v. United States, 348 F.2d 941 (Ct. Cl.1965), was a case of financial inability peculiar to the contractor and is distinguishable under the doctrine of "subjective impossibility," that a promisor's duty is never discharged "by the mere fact that supervening events deprive him of the ability to perform, if they are not such as to deprive other persons, likewise, of ability to render such a performance." 6 Corbin, Contracts § 1332, at 361 (1962). And in Carnegie Steel Co. v. United States, 240 U.S. 156, 36 S.Ct. 342, 60 L.Ed. 576 (1916), which is most nearly apposite in that it concerned a claim by the promisee for delay occasioned by an unanticipated technological problem encountered by the promisor, the precise issue was whether the difficulty came within a clause excusing delays resulting from "unavoidable causes, such as fires, storms, labor strikes, action of the United States, etc." 240 U.S. at 163, 36 S.Ct. at 344. On the other hand, the mere fact that the Government's cases do not dictate decision in its favor does not mean that defendant wins; it means only that we must seek guidance elsewhere.

■ We find persuasive the defendant's suggestion of looking to the Uniform Commercial Code as a source for the "federal" law of sales. The Code has been adopted by Congress for the District of Columbia, 77 Stat. 630 (1963), has been enacted in over forty states, and is thus well on its way to becoming a truly national law of commerce, which, as Judge L. Hand said of the Negotiable Instruments Law, is "more complete and more certain, than any other which can conceivably be drawn from those sources of 'general law' to which we were accus-

tomed to resort in the days of Swift v. Tyson." New York, N. H. & H. R. Co. v. Reconstruction Finance Corp., 180 F.2d 241, 244 (2 Cir. 1950). When the states have gone so far in achieving the desirable goal of a uniform law governing commercial transactions, it would be a distinct disservice to insist on a different one for the segment of commerce, important but still small in relation to the total, consisting of transactions with the United States.

■ Section 2–615 of the UCC, entitled "Excuse by failure of presupposed conditions," provides that:

"Except so far as a seller may have assumed a greater obligation * * * delay in delivery or non-delivery * * * is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made * * *"

The latter part of the test seems a somewhat complicated way of putting Professor Corbin's question of how much risk the promisor assumed. Recent Developments in the Law of Contracts, 50 Harv.L.Rev. 449, 465–66 (1937); 2 Corbin, Contracts § 1333, at 371. We see no basis for thinking that when an electronics system is promoted by its manufacturer as a revolutionary breakthrough, the risk of the revolution's occurrence falls on the purchaser; the reasonable supposition is that it has already occurred or, at least, that the manufacturer is assuring the purchaser that it will be found to have when the machine is assembled. As Judge Graven said: "The Board in its invitation for bids did not request invitations to conduct a development program for it. The Board requested invitations from manufacturers for the furnishing of a computer machine." Acceptance of defendant's argument would mean that though a purchaser makes his choice because of the attractiveness of a manufacturer's representation and will be bound by it, the manufacturer is free to express what are

only aspirations and gamble on mere probabilities of fulfillment without any risk of liability. In fields of developing technology, the manufacturer would thus enjoy a wide degree of latitude with respect to performance while holding an option to compel the buyer to pay if the gamble should pan out. See Austin Co. v. United States, 314 F.2d 518, 521, 161 Ct.Cl. 76, cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963). We do not think this the common understanding—above all as to a contract where the manufacturer expressly agreed to liquidated damages for delay and authorized the purchaser to resort to other sources in the event of non-delivery. Contrast National Presto Industries, Inc. v. United States, 338 F.2d 99, 106–112, 167 Ct.Cl. 749 (1964), cert. denied, 380 U.S. 962 (1965). If a manufacturer wishes to be relieved of the risk that what looks good on paper may not prove so good in hardware, the appropriate exculpatory language is well known and often used.

Beyond this the evidence of true impracticability was far from compelling. The large sums predicted by defendant's witnesses must be appraised in relation not to the single computer ordered by the Federal Reserve Board, evidently for a bargain price, but to the entire ALWAC 800 program as originally contemplated. Although the record gives no idea what this was, even twenty-five machines would gross $10,000,000 if priced at the level of the comparable IBM equipment. While the unanticipated need for expending $1,000,000 or $1,500,000 on redesign might have made such a venture unattractive, as defendant's management evidently decided, the sums are thus not so clearly prohibitive as it would have them appear. What seemingly did become impossible was on-time performance; the issue whether if defendant had offered prompt rectification of the design, the Government could have refused to give it a chance and still recover not merely damages for delay but also the higher cost of replacement equipment, is not before us.

Affirmed.