**BETHLEHEM CORPORATION**

v.

**The UNITED STATES.**

**No. 162–67.**

United States Court of Claims.

July 14, 1972.

Frederick D. Sarkis, Radner, Pa., attorney of record, for plaintiff.

Michael J. Rubin, Washington, D. C. with whom was Asst. Atty. Gen., Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, DAVIS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Lloyd Fletcher with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on February 22, 1972, wherein such facts as are necessary to the opinion are set forth. Plaintiff filed a request for review by the court of the commissioner's opinion and recommended conclusion and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiff is not entitled to recover, its motion for summary judgment is denied, defendant's cross-motion is allowed, and the petition is dismissed.

## OPINION OF COMMISSIONER

FLETCHER, Commissioner:

Under a fixed-price contract with the Department of the Army, plaintiff agreed to furnish, deliver, install, and test an environmental test chamber. Plaintiff now asks the court to reverse a decision of the Armed Services Board of Contract Appeals which denied plaintiff's appeal from a default termination of the contract by the contracting officer. The parties are in agreement that the Board's findings of fact contained in the first eight paragraphs of its opinion are correct, and they are therefore treated as stipulated by the parties. Those findings are as follows:

The appeal is from a default termination of a contract to furnish, deliver, install and test an environmental test chamber at the Army Cold Regions Research and Engineering Laboratories (CRREL). The contract price was $24,950. The award was made in June 1963. Appellant seeks conversion to a termination for convenience and a remand for submission of a claim. We have no claim before us by the Government for damages or excess costs. After termination another procurement of an environmental chamber was begun under somewhat altered specifications but no contract was awarded, apparently because of a lack of funds.

CRREL, or the Laboratory as we shall call it, had a requirement for conducting experiments to determine the effect of certain environmental conditions on the age hardening or metamorphism in properties of snow and possibly ice and frozen ground. These conditions were temperature, relative humidity and a reduced atmospheric pressure. The Laboratory had very little competence concerning the state of the art or knowledge of what equipment might be available to simulate the necessary environment. Therefore, the Laboratory wrote to several environmental chamber manufacturers. The replies included brochures but none of the brochures showed shelf items of equipment that entirely met the Laboratory's needs. Every response showed standard items that could simulate the necessary altitudes and temperatures but none that could simulate the relative humidity conditions at temperatures below freezing down to very low temperatures.

Mr. Wuori, Chief of the Applied Research Branch at the Laboratory, then began to contact certain of the manufacturers including the appellant. He filled out a Bethlehem Corporation questionnaire form, showing the type of chamber and performance requirements desired. The relative humidity requirements that he specified on the form, not counting the tolerance, were 10% to 95% from −100°F to +100°F. Adjacent to these requirements he asked the question, "Not std is this possible."

The answers on questionnaire showed what the Laboratory wanted to achieve. After the Laboratory filled out and sent the form to appellant, correspondence and telephone calls followed. Appellant wrote to the Laboratory saying that humidity could not be simulated or controlled below a temperature (or dew point) of 35°F. Mr. Wuori then had telephone conversations with Mr. Rosenblatt, a Bethlehem employee. Mr. Rosenblatt is a mechanical engineer and has been Chief of Bethlehem's Environmental Division since several months after the award of the contract.

In these conversations Mr. Wuori asked Mr. Rosenblatt if Bethlehem could develop a system of controlling humidity below freezing even though such a system was not then a shelf item. Mr. Rosenblatt replied that he was not sure, but would check on the components, sensors and that sort of equipment and would call back and let Mr. Wuori know if it was possible. He did call back and advised that he had checked with several firms, such as Minneapolis-Honeywell and it

would be possible to simulate relative humidity conditions below freezing, but limited to a minus 40°, not down to minus 100°, which was completely impossible. Mr. Wuori also received the same information from another firm. Thereafter Mr. Wuori prepared the specifications based on the information that it would be possible to simulate the specified conditions, i. e., down to −40°.

Bethlehem, as well as other firms, then received an invitation for bids. The firm knew what the Laboratory wanted and decided it could be done. Mr. Rosenblatt was not the individual chiefly responsible for deciding that the firm could furnish equipment that would meet the performance requirements of the specifications. The individual who was responsible is no longer with the firm.

Bethlehem submitted the only bid and was awarded the contract. The equipment was produced and delivered but it never met the requirement for control of relative humidity at the low temperatures specified. Appellant did not adequately test the ability of the equipment to meet the performance requirements before shipping it to the Laboratory in February 1964. Throughout the year until termination in December 1964 a series of mechanical breakdowns occurred. We will not discuss in detail these breakdowns, nor appellant's contention that the Laboratory never furnished test reports and details of the operation of the equipment by Laboratory personnel. There is no evidence of any improper operation of the equipment that is material to the case. It is obvious from the evidence of repeated and extensive visits by appellant's personnel to repair and test the equipment that appellant had the opportunity to know how the equipment was being operated, what tests were being run and what difficulties were continually being encountered.

That evidence, which tended to show mechanical unreliability of the equipment, is essentially irrelevant. The reliability of the equipment was, of course, important to the parties in the administration of the contract because it was initially assumed that the equipment would meet the performance requirements if it operated reliably. In addition it seems probable that the Laboratory would have arranged for an amendment to the contract to accept the unit if it could have met less difficult but still useful requirements and if it had also been reliable. But by the time of the hearing it was clear to both parties that, irrespective of the reliability of the equipment, it was incapable of meeting the contract requirements. In fact appellant's case is based upon impossibility of performance.

The Board described the technical difficulty encountered in "an oversimplified but adequate way" by noting that the equipment was designed to achieve relative humidity in a test chamber into which water vapor was directly injected. However, at low temperatures the vapor froze instead of humidifying the air, and plaintiff was never able to correct this undesirable and, to plaintiff, unexpected result. According to the expert testimony before the ASBCA, the performance specifications set forth in the contract were possible of achievement provided the vapor was temperature-conditioned in a separate chamber prior to being injected into the test chamber. The experts agreed that a facility consisting of a single test chamber, such as provided for in the contract, would not be able to meet all the performance specifications.

Without making a specific finding on the matter, the Board assumed that the contract, as written was impossible of performance. Nonetheless, the contractor's appeal was denied on the ground that, under the circumstances of the contract negotiations, the contractor must be held to have assumed the risk of impossibility. The Board said:

\* \* \* But assuming, without deciding, that appellant is right in con-

tending that the contract, as written in its entirety, was impossible to perform within the then known state of the art and that *no research and development was contemplated* within the delivery schedule (135 days after award) we still do not think the Government is liable. It is our view that the circumstances surrounding the execution of the contract clearly establish that appellant assumed the risk that it would incur uncompensable costs in unsuccessfully attempting to perform. Instead of representing, expressly or impliedly, that the performance requirements could be met, the Laboratory prepared the specifications after *appellant* represented that they could be met. [Emphasis in original.]

The Board's analysis seems clearly correct. In this connection, two relevant decisions of this court require comparison with the present case although neither is cited by the Board. Those decisions are Austin Co. v. United States, 314 F.2d 518, 161 Ct.Cl. 76, cert. denied, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963) (relied upon by defendant) and Hol-Gar Manufacturing Corp. v. United States, 360 F.2d 634, 175 Ct.Cl. 518 (1966). In *Austin,* the contractor's failure to perform was due to the impossibility of manufacturing a new digital data recording system as required by the specifications. However, those specifications were drafted by the contractor itself and were substituted for the Government's original specifications. In dismissing the contractor's petition, the court said at 314 F.2d 520, 161 Ct.Cl. 81:

Thus, while free to refrain from contracting, plaintiff came forward with its own design which was integrated into the contract. From the above, it is readily apparent that plaintiff believed it could not perform under the Government's specifications. However, it not only believed possible, but *promised* to perform under its own substituted specifications. Under these circumstances, we are faced with the fact that plaintiff had full

knowledge of the perils of performance and entered into the contract with its eyes open. This, in our opinion, would indicate that plaintiff fully assumed the risks of impossibility of performance. * * *

By contrast, in *Hol-Gar,* the court observed that "the governing specifications were entirely drafted by the defendant." 360 F.2d 639, 175 Ct.Cl. 526. When the specifications turned out to be impossible of performance, the court held that the contractor was either entitled to an equitable adjustment covering its costs incurred in trying to perform or to recover damages for breach of warranty. Said the court:

* * * * * *

* * * When the Government contracts for supplies to be manufactured in accordance with Government specifications, there is an implied warranty that if the specifications are followed, a satisfactory product will result. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963); R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 124 Ct.Cl. 681 (1953). If the warranty is breached, i. e., the specifications are defective, the plaintiff is entitled to damages equal to the amount expended in trying to comply with the defective specifications. [360 F.2d at 638, 175 Ct.Cl. at 525.]

It is true that in preparing its specifications, the Government had the benefit of conferences with, and a Technical Proposal by, Hol-Gar, and since the same was true here, the case may be said to resemble the present one. However, in my opinion, there is a critical distinction between the two cases in a determination of which party assumed the risk of impossibility. Unlike the present contract, the Hol-Gar contract contained a special testing provision which clearly showed that the Government recognized the possibility that tests might indicate the need for changing the specifications and that, in such

event the Government assumed the risk of bearing the costs incident to such a change. See the full discussion of this special provision in Judge Davis' concurring opinion, 360 F.2d 639, 175 Ct.Cl. 526.

On this analysis, it seems to me that the present case must be said to fall somewhere between the opposing poles of *Austin* and *Hol-Gar.* To which pole is it nearer? In my opinion, it lies nearer to *Austin.*

Admittedly, unlike the facts in *Austin,* here Bethlehem did not itself prepare the specifications, although its Technical Proposal was made a part of the contract. However, prior to bidding, Bethlehem assured the Government's representative that the specifications were reasonable and attainable.[1] Bethlehem was aware that it was being consulted as a leading expert in environmental chamber manufacture and that the Government's project engineer was not an expert in that area. On the record before it, the Board correctly found there was no showing that the Laboratory, or the purchasing office, or any other Government activity *involved in preparing the specifications,* knew anything about the technical difficulties Bethlehem might experience or had knowledge equal to or superior to that possessed by Bethlehem. Hence, cases such as Helene Curtis Industries, Inc. v. United States, 312 F.2d 774, 160 Ct.Cl. 437 (1963), Midvale-Heppenstall Co., 65–1 BCA ¶ 4629, and Johnson Electronics, Inc., 65–1 BCA ¶4628, where the Government did possess superior knowledge to that of the contractor, are distinguishable. The fact that there were humidity experts in the National Bureau of Standards with superior knowledge who would have anticipated the technical dif-

ficulties here encountered is immaterial. Knowledge of a different Government agency is not to be attributed to the contracting agency. S. T. G. Constr. Co. v. United States, 157 Ct.Cl. 409, 416–417 (1962).

From the invitation for bids, it is clear that the Laboratory was not requesting invitations for the conduct of a research and development program. It was requesting invitations from manufacturers for the furnishing of an environmental test chamber which would perform within designated limits—limits which Bethlehem had already advised were attainable. Under such circumstances, the contractor should be held to have assumed the risk of nonperformance. The reason has been stated by Judge Friendly in United States v. Wegematic Corp., 360 F.2d 674 at pp. 676–677 (2d Cir., 1966):

\* \* \* Acceptance of defendant's [contractor's] argument would mean that though a purchaser makes his choice because of the attractiveness of a manufacturer's representation and will be bound by it, the manufacturer is free to express what are only aspirations and gamble on mere probabilities of fulfillment without any risk of liability. In fields of developing technology, the manufacturer would thus enjoy a wide degree of latitude with respect to performance while holding an option to compel the buyer to pay if the gamble should pan out. [Citing *Austin, supra.*]

## CONCLUSION

For the reasons stated above, the plaintiff's motion for summary judgment is denied, the defendant's cross-motion is allowed and the petition is dismissed.

---

1. According to uncontradicted record testimony, plaintiff's Mr. Rosenblatt telephoned defendant after receiving the specifications and before bidding. He said there were certain things that should be changed. The defendant, as a result of this call, issued Amendment No. 1 to the specifications, fully meeting Mr. Rosenblatt's proposals. The inference would of course be that as amended the specifications had plaintiff's full approval. [Footnote by the court.]