## GULF WESTERN PRECISION ENGINEERING CO.

### v.

### The UNITED STATES.

### No. 335–70.

United States Court of Claims.

Oct. 20, 1976.

Glade F. Flake, Washington, D. C., attorney of record, for plaintiff. Thomas E. Harrison and Wachtel, Wiener, Ross & Matzkin, Washington, D. C., of counsel.

Ray Goddard, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before LARAMORE, Senior Judge, and DAVIS and BENNETT, Judges.

## ON PLAINTIFF'S NOTICE AND MOTION, AND DEFENDANT'S RULE 150(d) CROSS–NOTICE AND CROSS–MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFF'S RULE 141(b) MOTION

LARAMORE, Senior Judge:

This government contract case, governed by the Wunderlich Act, 41 U.S.C. §§ 321 and 322, is before us for the second time. Initially, we declined to accept the recommendation of the Trial Judge that we grant summary judgment for the plaintiff contractor[1] and reverse the decision of the Armed Services Board of Contract Appeals ("ASBCA" or the "Board") dismissing plaintiff's claim.[2] Instead, by Order,[3] we remanded that portion of the case then under consideration, involving review of the Board's action, for reopening and further consideration. The part remanded contained only the claims found in the third and fourth causes of action of plaintiff's four-count petition, as only those counts concerned review of the Board's decision.

Now, upon further consideration of the record, the briefs and arguments of counsel, and a review of the Board's decision after remand,[4] we conclude that the Board's action was neither arbitrary, capricious, unsupported by substantial evidence, nor contrary to law. Therefore, counts three and four of the petition, involving review of the Board's decision, must be dismissed.

### I. History of the Case

The contract at issue herein was awarded in response to a proposal submitted by plaintiff to the Navy upon its request for proposals for the production of Talos guided missile warheads. Four preproduction sample warheads, submitted for plant inspection as required by the contract, were approved by the Navy inspector for shipment and ballistic testing to be performed at a naval installation. However, plaintiff was thereafter informed that these samples had failed the ballistic tests, and the production and delivery schedule was postponed pending an investigation. In the course thereof, the failure of the ballistic tests was attributed by the parties to the fact that in fabricating the samples, plaintiff had followed only the contract's mandatory drawings and design specifications, substituting its own techniques of fabrication for references in the contract to certain advisory or suggested techniques.[5]

The problem with the samples tested appeared to involve the configuration of the weld hinge in what was termed the rod bundle of the warhead. Basically, the warhead was composed of a hollow cylinder with an explosive cavity. The rod bundle consisted of individual square steel rods welded together at their ends to produce an

---

1. Plaintiff was, at the time of the contract, known as Portland Copper & Tank Works, Inc.

2. *Bliss-Portland*, ASBCA No. 12453, 68–2BCA, ¶ 7.270. At the time of this initial decision of the Board, plaintiff was known as Bliss-Portland. It was thereafter acquired by Gulf & Western Precision Engineering Company, as above-captioned. .

3. *Gulf and Western Precision Engineering Company*, 203 Ct.Cl. 732 (Order of January 4, 1974).

4. *Bliss-Portland*, ASBCA No. 12453, 75–1 BCA, ¶ 11,118.

5. Sometime after the initial preproduction samples had been rejected by the government, plaintiff wrote to the contracting officer and advised that it would furnish four additional preproduction samples for ballistic testing, and that these would be manufactured in strict accordance with the contract, except that references therein to advisory drawings would also be considered mandatory. The letter went on to request an amendment to the contract to include the advisories as part of contract mandatory requirements. This was said, by plaintiff, to be a change order designed to more closely align the manufacturing specifications with the performance specifications.

While this request for a formal change order was denied, plaintiff was informed that the government was taking the position that the existing contract specifications already permitted fabrication in accordance with the advisory drawings.

item somewhat resembling an expansion wrist watch band. For various technical reasons, the manner, shape and strength of the welds were vital to the warheads' performance.[6]

A second group of four preproduction samples was subsequently manufactured in accordance with the mandatory *and* advisory specifications. These were then test-fired. While plaintiff was advised that these samples were acceptable, it is now clear that they never actually satisfied the ballistic test requirements contained in the contract which, it also turns out, could never have been met consistently even through the use of both mandatory and advisory specifications. In short, the contract was impossible to strictly perform, because the performance required exceeded that given by the product called for in the contract's drawings and designs.

Suffice it to say, production was allowed to proceed using as a model the second set of samples. The contract was completed and the fixed payment made by the government thereunder.

Plaintiff filed a claim under the "Disputes" and "Changes" clauses[7] in the contract, for increased costs it attributed to the defects in the contract specifications. The claim was denied by the contracting officer and also on appeal by the Secretary of the Navy, represented by the ASBCA. Thereafter, plaintiff filed a petition in this court under our basic jurisdictional statute 28 U.S.C. § 1491, also citing the Wunderlich Act, *supra.*

The petition asserts four causes of action. The first contends a breach of contract in that plaintiff was required to embark upon a research and development program to pass the ballistic requirements, and to alter

---

**6.** Each rod was about 19¼″ long and ¼″ wide on each of its four sides. The rods were welded together to produce an item somewhat resembling an expansion wrist watch band. There were upper and lower layers of rods. Each layer was placed parallel to the other. One end of an upper rod was welded to the corresponding end of a lower rod. The other end of the upper rod was welded to the corresponding end of the adjacent lower rod. When stretched apart, the result was something like a continuous series of W's (*i. e.*, WWW).

The rod bundle was wrapped around the hollow cylinder containing the explosive. When the explosive was detonated, the rod bundle was designed to expand outward at high velocity to form a continuous hoop of steel, to be propelled toward a target at approximately 4,000 feet per second. The welds at the ends of the rods were intended to serve as hinges during the expansion of the rod bundle into a hoop. The end product, going through the air, was meant to either sever a missile structure or airplane fuselage, or so damage the structural member that the flying load of the airplane would break the fuselage.

**7.** "3. CHANGES

"The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawing and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. * * * If the parties fail

to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed.

"6. DISPUTES

"(a) Except as otherwise provided in this contract, any dispute concerning a question of fact arising under the contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless, within 30 days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the Secretary. The decision of the Secretary or his duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. * * *

"(b) This 'Dispute' clause does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above: *Provided,* that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law."

its manufacturing methods to "hand make" the warheads, while defendant knew that they would not consistently pass the ballistic tests whatever plaintiff did, and failed to so advise plaintiff. The second cause of action alleges a breach of contract in that plaintiff was advised that its second submission of preproduction samples met ballistic test requirements, when it did not, causing plaintiff to institute and to continue extraordinary manufacturing procedures not required by the contract. The third cause alleged that the government-furnished specifications were defective in that, if followed, the warheads would not meet the ballistic test requirements of the contract, and the decision of the ASBCA to the contrary was arbitrary, capricious, not supported by substantial evidence, and legally erroneous in its interpretation of the contract. Finally, as a fourth cause of action, plaintiff alleges that the ASBCA was arbitrary, capricious and legally in error in denying plaintiff's timely motion for reconsideration when it came to light that defendant was withholding information as to the true status of the ballistic test results.

At a pretrial conference, it was concluded that the parties should initially file cross-motions for summary judgment with the Trial Judge with respect to Counts III and IV, presenting their respective positions with regard to the Board's decision, without prejudice to plaintiff's right to claim entitlement to a trial on the counts alleging breach of contract, should they remain after the decision on the motion. Cross-motions were thereupon filed and briefed.

As indicated above, the Trial Judge recommended that we grant plaintiff's motion and remand the case to the ASBCA for a determination of the amount of the equitable adjustment to which plaintiff was to be entitled. Upon review pursuant to Rule 54(b), we remanded the case, but for a different purpose. Our Order directed that the case be reopened by the Board, certain new evidence admitted [8] and, finally, that

8. The exhibits concerned were documents which had been received by the Board in another case, *General Precision, Inc.,* ASBCA No. 12078, 70–1 BCA ¶ 8144, heard and decided approximately one and a half years after the board's initial decision in the instant case. The former involved a claim pertaining to a procurement of warheads manufactured according to specifications almost identical to the ones now in question. There the Board had considered the exhibits here at issue in reaching its conclusion that General Precision's warheads had not passed the ballistic test requirements after the advisory specifications had been followed and that, therefore, the specifications were defective. In the case at hand, plaintiff had sought by motion to reopen its case before the Board on the basis of these exhibits. The Board declined. We reversed the Board on that point, but concluded that the case was not then ready for final determination in light of Wunderlich Act standards which do not permit us to make a final determination as to entitlement on the basis of evidence which the Board refused to receive into the record, or on fact findings in another case.

After the Board received the remand order the parties were directed to file a statement of issues, in connection with which the Board sent the parties the following letter:

"Gentlemen:

"The time to file a statement of issues is extended for thirty days. In arriving at a statement of issues the parties should consider, *inter alia,* the following facts:

"1. The Court's remand order requires reopening of the record and 'reconsideration, including all evidence relevant to the issue as to whether plaintiff's preproduction warheads met the ballistic test requirements, or whether it was possible to meet these requirements under the specifications, either mandatory or advisory.'

"2. This ruling was apparently precipitated by the Board's denial of the motion to reopen and reconsider in the light of exhibits tending to show that the ballistic requirements could not be met.

"3. Throughout the claim and appeal, *i. e.,* from the time of its claim letter of 11 April 1966 through its second reply brief, appellant consistently took the position that, when it used the 'mandatory' specifications, it failed to meet the test requirements; but, when it followed the 'advisory' specifications, it did meet contract requirements or 'successfully completed its warhead production.'

"4. The costs claimed were those of following the advisory specifications to achieve that successful production. Nowhere was a claim made that costs were incurred in an effort to meet the ballistic requirements one hundred percent when such a result was impossible. Nowhere did the Board find that appellant or anyone else achieved such a result. The record does not indicate that appellant thought its second preproduction units met the ballistic

the case be reconsidered. Upon remand, in a second opinion, the Board again denied plaintiff's claim.

Following this second Board decision, both parties filed with the court the notices required by Rule 150(d). Plaintiff urged further action by the court, while defendant was content to let the decision of the Board stand.

In response to these notices, the Trial Judge ordered plaintiff to file a motion under Rule 141(b) requesting the court to adopt, with some modifications, the Trial Judge's previously recommended opinion. The case is, therefore, before us now on the parties' Rule 150(d) cross-notices, which are deemed to incorporate and reassert their prior cross-motions for summary judgment, and plaintiff's Rule 141(b) motion.

## II. The Third and Fourth Causes of Action

Counts III and IV of the petition request Wunderlich Act review of the decision of the Board denying plaintiff's claim. Count IV requires little, if any, further consideration. As noted above, it alleges that the

Board was arbitrary in refusing to reopen plaintiff's case, admit new evidence and reconsider the matter, and the Board, under our instructions upon remand, reopened the case, admitted the new evidence, reconsidered the case and rendered a second decision.

The merits of the case, insofar as Wunderlich Act review is requested, are actually found in the third cause of action. Consideration of this count's charge that the Board erroneously interpreted the subject contract requires further scrutiny of the contract terms.

The contract required that the warheads be "manufactured in strict accordance with the Bureau of Naval Weapons List of Drawings L.D. 534515, Revision A, and the drawings and specifications listed thereon." The provision continued:

\* \* \* The following list of drawings and specifications shall be applicable to the warhead assemblies to be furnished hereunder.

\*    \*    \*    \*    \*    \*

Drawing 2176094, Sheet 1, Revision B (Confidential).

requirements one hundred percent. The 3 September 1963 letter merely says they were 'considered acceptable.' Respondent's exhibit 4, page two of the DD 375, shows the contractor received the firing results September 9, 1963. And appellant's own witness testified at the hearing to his knowledge that the Government reduced the continuity requirement, and accepted appellant's production without requiring that it meet the specifications one hundred percent.

"Accordingly there was no issue before the Board of whether the specifications were defective in specifying an impossible set of ballistic requirements. Appellant did not claim it tried but failed to meet such requirements. Knowing that it met only the reduced requirements, appellant claimed it succeeded, but only by following the 'advisories.' Its claim was that it was not permitted to use the advisory specifications under the contract as awarded; therefore, when it was necessary to follow them to achieve successful production, it was doing extra work.

"Under these circumstances, and taking into account the Board's decision in *General Precision, Inc.*, ASBCA No. 12078, 70–1 BCA 8144, the parties should consider whether it may be stipulated as a fact, with no further need for

evidence or argument, that the specifications were defective insofar as they specified ballistic requirements which could not consistently be met under either the mandatory or advisory specifications. If so, it would appear that the Board could now simply reopen the record to admit the exhibits offered on the motion for reconsideration and receive the parties' stipulation. Then the parties could submit briefs on the effect of the exhibits and the stipulation on the Board's reconsideration of the appeal. This would expedite the proceedings on remand and, in the event the Board's reconsideration were not favorable, would permit more speedy return to the Court of Claims."

The parties agreed to a stipulation of facts and the submission of the exhibits that had previously been offered with the motion for reconsideration. In the stipulation the parties agreed that plaintiff's witness testified as to his knowledge that the government accepted plaintiff's production without requiring that it strictly meet the contract ballistic specifications. The parties also stipulated that there was no objection to the Board finding as a fact that the specifications were defective insofar as they specified ballistic requirements which could not be met consistently under either the mandatory or advisory specifications.

Drawing 2176094, Sheet 2, Revision B (Confidential).

Drawing 2176094, Sheet 3, Revision A (Confidential).

\* \* \* \* \* \*

[The actual list included numerous other drawings] Specification O.S. 11705 (Confidential).[9]

Drawing 2176094, Sheet 3, contained details "P" and "R", which provided a representation of the weld hinge in the rod bundle referred to earlier. It will be remembered that this weld hinge was identified by the parties as the source of the unsatisfactory ballistic performance of plaintiff's first set of preproduction samples.

There is considerable evidence in the record that plaintiff relied entirely upon its own technology and details "P" and "R" in fabricating the weld hinges in its first set of preproduction samples even though drawing 2176094 also referred, in a note, to a document entitled O.D. 20843, containing a suggested technique of fabrication. O.D. 20843 was introduced with the following preamble:

1.1 Purpose. This NAVWEPS Ordnance Data publication outlines instructions which are intended to serve as a guide for the fabrication and preparation of the rod bundle used on the warhead \* \* \*.

While it is clear from the record, and the Board so found, that neither of the parties regarded O.D. 20843, or the drawings accompanying it, as mandatory in the same sense as other contract requirements,[10] at the same time, we infer that this data was supplied with the intention of delineating methods and designs which would produce a product acceptable to the government, if strictly followed by the contractor. Significantly, O.D. 20843 was entitled "Advisory Instructions for the Fabrication of the Rod Bundle \* \* \*."

### III. The Controversy

Plaintiff urges that because the government-furnished specifications and drawings enumerated above were defective it incurred additional costs within the purview of the "Changes" clause in the contract. The additional expenses claimed include (1) the costs associated with manufacturing an unnecessary first set of four preproduction samples, which were rejected, and (2) extra costs incurred in finally performing the contract in accordance with the more costly advisory welding specifications, when this did not produce a warhead which satisfied the contract's ballistic requirements any more readily than did the welding technique plaintiff used to fabricate the first set of preproduction samples.

Plaintiff relies upon our holding in *Hol-Gar Manufacturing Corp. v. United States*, 360 F.2d 634, 175 Ct.Cl. 518 (1966), hereinafter "*Hol-Gar*". In that case, a contractor sued to recover additional costs it incurred in attempting to perform a contract to manufacture electric generator sets in accordance with specifications defectively drawn by the government. A change order amending the specifications had later been issued and accepted by the contractor with a reservation of its right to submit a claim for extra costs incurred in having first attempted to perform under the original specifications. In deciding the case when it came to this court after the ASBCA had denied the contractor's claim, we held that where a change is required by reason of

---

9. The ballistic performance required of the warheads was contained in O.S. 11705. Paragraph 3.2 made applicable the requirements of specification MIL–P–16594, covering the manufacture of guided missile inert parts. Paragraph 3.31 stated that the requirements for static load were such that the warheads, when tested in accordance with paragraph 4.31, would withstand a specified load without incurring any permanent deformation or weld failures. Paragraph 4.31 provided that each war-

head assembly was to be attached on a 20.240″ diameter flange and would have to withstand a uniform load of 6500 pounds applied in a purely axial manner against a 17.125″ diameter flange. Paragraph 3.33 specified that the weld hinge of the rod bundle should be capable of withstanding certain specified tensile loads.

10. Drawings designated for use with O.D. 20843 bore the legend "Illustration Only—Not for Manufacture".

defective specifications or drawings for which the government is responsible, a contractor is entitled to an equitable adjustment to compensate not only for any extra costs occasioned by the change, but also for extra costs incurred in attempting to comply with the originally defective specifications.

We conclude, however, that plaintiff's reliance on our holding in *Hol-Gar* is misplaced. For reasons which follow, this is so even though the facts here reveal that the government furnished defective specifications, and we deem a constructive change in the contract to have occurred when the ballistic test requirements were relaxed by the government to conform to the capability of the product to be manufactured in accordance with the existing specifications, both mandatory and advisory. And we are not unmindful of such cases as *LaCrosse Garment Mfg. Co. v. United States*, 432 F.2d 1377, 193 Ct.Cl. 168 (1970); *L. W. Foster Sportswear Co. v. United States*, 405 F.2d 1285, 186 Ct.Cl. 499 (1969), and cases therein cited, which stand for the proposition that a contractor is entitled to an equitable adjustment under the "Changes" clause for increased costs of performance *due* to defective specifications. But we have laid emphasis, in the preceding sentence, on the word *due* because of the three vital elements—(1) defective specifications, (2) causation, and (3) extra costs—in this case, as will appear, the element of causation is absent.

For purposes of analysis, we will examine plaintiff's claim (presumably grounded upon the constructive change mentioned above) in two separate segments, taking up pre-change additional costs first. These costs were the result of plaintiff's having produced an extra and perhaps unnecessary first set of four preproduction samples.

In *Hol-Gar*, pre-change extra costs were awarded which were the direct result of the contractor having explicitly followed defective specifications furnished by the government but which, even though conscientiously followed, produced an unacceptable result. In the case at hand, plaintiff ignored a portion of the technical material furnished by the government, that is to say certain of the advisory specifications, and elected to employ welding techniques of its own in fabricating the initial set of preproduction samples. We reason that in rejecting the teaching of the advisories plaintiff assumed the risk that its own techniques would not yield an acceptable result. (No doubt, in return for anticipating the assumption of the risk, plaintiff had been able to place itself in an advantageous bidding position in its fixed-price proposal because the advisories were evidently more costly to follow than the method plaintiff had planned to pursue.) [11]

Thus, the critical factual premise supporting our holding in *Hol-Gar*, that the government's specifications were followed by the contractor without deviation, is not present in the case before us now. Plaintiff is not, therefore, entitled to reimbursement for its pre-change additional costs because such were incurred only as the direct and proximate result of plaintiff's attempt to produce in accordance with its own less costly techniques, rather than the government-furnished design advisories.

The ASBCA, in its second decision, also considered the risk-shifting effect of plaintiff's failure to first follow the advisories, and we are in agreement that:

> * * * appellant [plaintiff] was on notice of the potential need to follow them and, when it chose not to do so initially, it assumed the risk that its own production methods might not work.

11. As more fully appears below, by ignoring the advisory designs plaintiff also chose—as it had the contractual right to do—to fashion the contract into one of the "performance type", from one of the "design type". However, plaintiff thus became a guarantor that the finished products would perform in accordance with the contract's specified performance criteria. Therefore, the risk that the contract's ballistic requirements were impossible of performance became the burden of the contractor by its own concerted election. *Cf., Bethlehem Corp. v. United States*, 462 F.2d 1400, 199 Ct.Cl. 247 (1972); *Austin Company v. United States*, 314 F.2d 518, 161 Ct.Cl. 76, *cert. denied*, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963).

The above-quoted paragraph is generally in accord with and supported by the *ratio decidendi* of several of our decisions. In *Austin Co. v. United States*, 314 F.2d 518, 161 Ct.Cl. 76, *cert. denied*, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963), we assumed that plaintiff's failure to perform was due solely to the fact that it was impossible to do so under the specifications. However, the latter were proposed by the plaintiff after it had reviewed defendant's specifications and found them unworkable. We held that plaintiff, having promised to perform under its own substituted specifications, fully assumed the risk of impossibility of performance. As the government was responsible for losses due to its own specifications if they were defective, the converse should apply to the plaintiff. *Accord, J. A. Maurer, Inc. v. United States*, 485 F.2d 588, 202 Ct.Cl. 813 (1973); *Bethlehem Corp. v. United States*, 462 F.2d 1400, 199 Ct.Cl. 247 (1972).[12]

We turn now to the subject of post-change additional costs. It will be remembered that these allegedly resulted from the government's insistence that plaintiff fabricate in accordance with the more costly advisory design specifications, even after the performance requirements of the contract had been constructively relaxed when it became known that they could not have been consistently met with the use of the advisories.

We must reject plaintiff's argument that its eventual use of the advisories in fabricating the full number of warheads required by the contract called for an equitable adjustment. This we do because we cannot agree that the advisories were ever employed by plaintiff in a manner not contemplated by the parties *ab initio*. The advisories were all part and parcel of the contract from its inception.

Moreover, the record does not support plaintiff's conclusion that the government "insisted" on compliance with the advisories. Apparently, when the initial set of four preproduction samples was found unacceptable, *both* parties thought that if the advisory welding techniques had been used, the required ballistic performance might have been achieved. For that reason, plaintiff then elected to follow the advisories in producing its second set of preproduction samples. When this second set of samples was tested, it became clear to both plaintiff and the government that the ballistic specifications would never be met under the contract's original design specifications, both mandatory and advisory. The performance requirements were, therefore, necessarily relaxed. Plaintiff continued to perform the contract by fabricating the warheads in accordance with the advisories. We conclude not that the advisories were "insisted" upon, but that plaintiff sought by their use to transfer to the government the risk that, when finally manufactured, the product would not adequately perform even under the relaxed ballistic standards. This option, all along contractually available, evidently became plaintiff's safest course and, as such, its choice.

It must also be remembered that plaintiff was fully cognizant after the ballistic tests on the second set of four preproduction samples, and before the start of actual production under the contract, that the government stood ready to accept warhead units produced strictly in accordance with the advisories even if such were not capable of satisfying the original or modified ballistic requirements of the contract.

It was with that in mind that plaintiff manufactured the warheads, the government accepted them, and the fixed price of the contract was paid.

Plaintiff, therefore, in effect urges us to grant it an equitable price adjustment for having produced in a manner not only per-

12. It is noted that these three decisions involve default terminations by the government, while in the instant case the contract was completed after a constructive change was made in the performance specifications. This distinction is of little consequence in light of our purpose here. We borrow from these cases only the narrow lesson that where a contractor substitutes design specifications of its own for those of the government, it assumes the risk that they will not adequately perform.

missible under the original design specifications and drawings, but suggested by them. It is plain that to do so would, as the ASBCA found, be contrary to both logic and the pertinent law. Simply stated, we find that the costs for which plaintiff seeks reimbursement were not extra costs incurred as a consequence of the constructive change made in the contract.

The Board, in its second decision, summarized the point thus:

> If the Government had not effectively changed the ballistic requirements so that the original requirements became immaterial, or if it had misled appellant into incurring extra costs in an impossible task while misrepresenting the ballistic test results, we would have a different case. Here appellant knew or should have known from the start that it might have to use the advisory specifications to achieve a successful result. We do not believe it is entitled to extra costs for having done just that after having tried its own methods and failed.

## IV. Conclusion

Accordingly, for the above reasons, plaintiff's motion under Rule 141(b) is denied. Defendant's cross-motion for summary judgment (incorporated and reasserted in its Rule 150(d) cross-notice) is granted. Plaintiff's motion for summary judgment (likewise incorporated and reasserted in its Rule 150(d) notice) is denied.

Counts III and IV of the petition are dismissed.

BENNETT, Judge (concurring in part and dissenting in part):

While I join in the balance of the court's opinion, I am unable to agree that plaintiff is not entitled to recover the costs it incurred in building the four rejected preproduction models. The court bases its holding for defendant here on the ground that plaintiff should have, but did not, follow

certain advisory specifications, and so "in rejecting the teaching of the advisories plaintiff assumed the risk that its own techniques would not yield an acceptable result." The court, I think, misperceives the risk that plaintiff ran when it opted, in the first instance, for its own welding techniques over those found in the advisory specifications. Moreover, I think it does so precisely because it fails to appreciate the difference between the Government's design specifications, part of which were advisory, and the Government's performance specifications.

All are by now agreed that the performance specifications which plaintiff tried to meet when it built the first four preproduction models were impossible of attainment, even with the employment of the advisories' techniques. The parties stipulated this to be true and the board's opinion of February 21, 1975, page 13, although thinking this to be irrelevant, said in pertinent part:

> * * * it should now be clear that the specifications were defective in specifying ballistic requirements that could not be met consistently under either the mandatory or advisory specifications. * * *.

It is not true, as the court seems to be saying, that plaintiff assumed all conceivable risks that it would not be able to meet the performance specifications when it opted to disregard certain advisory design specifications. When it did the latter, plaintiff assumed the risk, and only the risk, that it would not meet performance specifications *possible* of performance. Plaintiff decidedly did not run the risk that it would be impossible to comply with the performance specifications. Plaintiff's choice of welding techniques had no effect whatever on the performance requirements. Plaintiff cannot, within the precedents, be held to have assumed the risk of impossibility with respect to specifications unless it designed them [1] or else contractually agreed

---

1. The court's citations to *Bethlehem Corp. v. United States*, 462 F.2d 1400, 199 Ct.Cl. 247 (1972), and *Austin Co. v. United States*, 314 F.2d 518, 161 Ct.Cl. 76, *cert. denied*, 375 U.S.

830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963), are inapposite. In *Bethlehem*, the Government wrote the performance specifications in reliance on the contractor's statements regarding

to assume the risk, neither of which was the case here. *J. A. Maurer, Inc. v. United States*, 485 F.2d 588, 202 Ct.Cl. 813 (1973).

Based on the above, I think plaintiff is entitled to an equitable adjustment in the amount of its costs in constructing the original four preproduction models, and I dissent from the contrary holding of the court.

what was attainable; in *Austin*, the contractor itself drew up the performance specifications. Here, however, the contractor took no part in the creation of the performance specifications. It therefore simply does not follow from the cited cases that the risk of impossibility as to the end requirements (as distinguished from the design specifications) ever became plaintiff's responsibility. When plaintiff elected to ignore the advisories, it assumed only the risk that its design would not meet the Government's performance requirements.