2020 IL App (1st) 191972-U

THIRD DIVISION
September 30, 2020

Nos. 1-19-1972 and 1-19-2038, Consolidated

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| CHRISTOPHER GLASS & ALUMINUM, INC., | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee and Counterdefendant-Crossappellant. | ) ) ) | Cook County. |
| v. | ) ) | No. 16 L 3919 |
| TISHMAN CONSTRUCTION CORPORATION OF ILLINOIS, | ) ) ) ) | Honorable |
| Defendant-Appellant and Counterplaintiff-Crossappellee. | ) ) | Diane M. Shelley, Judge Presiding. |

_____

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County is affirmed in part and vacated in part; the trial court's judgment limiting the plaintiff's damages to those provided by the terms in the contract is affirmed since the defendant's breach of contract is affirmed; the trial court's judgment failing to award damages for the defendant's separate breach of contract based on an implied warranty of accuracy and sufficiency of its plans and specifications for the plaintiff's work is vacated and the cause is remanded for the court to clarify its judgment on the plaintiff's breach of contract claim and to enter an appropriate damages award.

¶ 2    Plaintiff, Christopher Glass and Aluminum, Inc. (CGA), contracted with defendant,

Tishman Construction Corporation of Illinois, to deliver and install the window system for a 21-

story glass mixed used building defendant was constructing as the general contractor. The

parties' contract included plans and specifications for the window system and, additionally, specified the window system plaintiff was to install by name and required plaintiff to use that named system "exclusively." It was subsequently determined the named window system would not meet defendant's requirements for the window system, the installation of the window system was delayed, and eventually the defendant switched to a different window system. Defendant terminated the contract, purportedly for cause. Plaintiff filed suit against defendant for breach of contract and defendant filed counter-claims against plaintiff. Following a bench trial the circuit court of Cook County entered judgment in favor of plaintiff and against defendant on all claims in the complaint and counter-claim and awarded plaintiff damages pursuant to a limitation of damages provision in the contract. Defendant appealed the judgment for damages to the extent the judgment failed to charge plaintiff with construction delays attributable to the delivery and installation of the window system. Plaintiff cross-appealed the trial court's judgement limiting damages pursuant to a term in the parties' contract.

¶ 3    For the following reasons, we affirm in part, vacate in part, and remand with instructions.

¶ 4                                    BACKGROUND

¶ 5    Plaintiff, Christopher Glass and Aluminum, Inc. (CGA), filed a complaint against defendant, Tishman Construction Corporation of Illinois (Tishman), to recover damages for wrongful termination of a subcontract related to the construction of a building. Tishman was the general contractor for the construction project. Tishman contracted CGA to deliver and install the building's exterior glass windows (referred to as the "window system" or "window wall system"). Tishman filed a counter-complaint against CGA seeking damages for CGA's alleged breach of the subcontract and fraud in the inducement of the subcontract. The building was to be

a 21-story glass apartment/retail complex. The owner of the building (Owner) and the architect for the building (hereinafter, "Gensler" or "Architect") are not parties to this appeal.

¶ 6       Owner contracted Tishman as the general contractor for the construction of the building. Architect created drawings and specifications (specifications) for the building. Tishman used those specifications to contract subcontractors for various elements of the work needed to construct the building including the exterior windows. Gary Thalheimer was the executive vice-president and regional manager for Tishman during the relevant time period. Thalheimer testified that Tishman had no involvement in drafting the specifications. He also testified that Tishman's role with respect to the specifications was to "monitor them in terms of ensuring that what we thought the cost of the project was and the schedule that we had proposed when we were bidding the project would be adhered to as the design evolved, the plans and specs as they developed further."

¶ 7       The building specifications the architect created regarding the window system are relevant to the issues on appeal. The relevant section of the specifications is titled "Glazed Aluminum Curtain Walls." That section states that it "includes glazed aluminum curtain wall assemblies for the entire project" and that the "aluminum curtain wall assemblies work includes *** [g]lass and glazing for the windows, window walls, curtain walls, entrances and storefronts" and "installations." The specifications included, but were not limited to, thermal performance requirements, condensation resistance conditions, and thermal break construction specifications. Stephen Miller, an employee of Architect and an architect himself, testified that the glass work was "not a design build project."

¶ 8       Tishman sent the specifications to potential subcontractors including potential subcontractors for the glass work on the building. During a second round of bidding CGA

attended a meeting with Architect. Owner and Tishman were present for the meeting, as was U.S. Aluminum (USA). USA is CGA's window system vendor. USA is not a party to this appeal. At this meeting USA proposed using USA's structurally glazed (4500) system (USA 4500 window system). When asked, "Who first suggested the US Aluminum system?" the lead architect on the project, Stephen Miller, responded, "Tishman would have." George Heflin, the vice-president of sales for USA testified via evidence deposition that at this meeting he "suggested the use of the 4500T SSG system, which was another unitized window wall system." Heflin testified he began "conversing back and forth regarding the merits and the attributes of the 4500T SSG" with Architect's consultant who was present and the meeting and the consultant "thought it was an ideal, a system that would be ideally suited for the use in this particular application." Ultimately CGA bid on the subcontract. CGA's bid states it was "pleased to submit our proposal to furnish materials and labor for the [building] based upon the ['Glazed Aluminum Curtain Walls']" specification Architect prepared (which CGA referred to by number from the specifications). Thalheimer testified CGA's bid stated that CGA was "proposing to furnish and install window wall openings CRL/United States Aluminum CW4500 thermal window wall system." Thalheimer testified he interpreted that language to mean "they were telling us what system was going to meet the criteria."

¶ 9     The bid was transmitted to Owner and Architect. On October 6, 2014, Owner emailed Tishman stating, in pertinent part, as follows:

> "[Architect has] found the window systems proposed by Tishman's subcontractor, [CGA,] to satisfy the *** project's design to be acceptable for use. The system found to most satisfactorily conform to the project's requirements is [USA's] structurally glazed (4500) system to be used exclusively for the main building's

glass systems modified, where required, with the structurally adhered external aluminum components."

¶ 10    Thereafter, on October 28, 2014, Tishman and CGA executed the subcontract that is the subject of this appeal.  Tishman drafted the subcontract.  USA's vice-president, George Heflin, testified via evidence deposition that at the time CGA contracted with Tishman it was his opinion at that time that USA's system that CGA proposed could have performed "per the specs in the contract."

¶ 11    The parties' subcontract includes a section titled "Trade Specific Scope of Work."  That section contains the following provisions that are relevant to the issues in this appeal:

"8.    Furnish and install all Glazed Aluminum Curtain Walls system as manufactured by [USA] for all systems, fully operational meeting design criteria provided in the specifications and shown on drawings.  The approved system is the [USA] structurally glazed (4500) system to be used exclusively for the main building's glass systems modified, where required, with the structurally adhered external aluminum components.

* * *

11.    Furnish and install system with – Max U-value 0.38; Max SHGC 0.33."

CGA's owner, Abraham Asllani, testified he understood he was only to use the "structurally glazed system" because the contract said "exclusively."

¶ 12    The subcontract also includes two relevant sections titled "Shop Drawings."  The first of those two sections describes "Shop Drawings."  The second section of the subcontract addressing shop drawings states there are two distinct types of shop drawings required for the work.  Those two types are listed as "Testing Laboratory Mockup(s) Shop Drawings" of "mockup(s) showing

details of the test specimen(s)" and "Production Shop Drawings." The Production Shop Drawings subsection states: "No work shall be fabricated until shop drawings for that work have been approved by Architect for fabrication." This section then goes on to state its intent as follows:

> "The intent of the foregoing is to prohibit fabrication of exterior wall system components (curtain wall, architectural precast concrete, and stone) prior to the results of the testing laboratory mockup and testing program, it is not intended to preclude the submittal of shop drawings \*\*\* for the exterior wall systems prior to testing laboratory mockup and testing."

¶ 13    Asllani testified that after the parties signed the agreement "there were some questions in regard to various performance characteristics of the system." On November 4, 2014, Roberto Eljaiek, senior project manager for the building, emailed CGA with a list of USA "system questions." Among the statements in that email relevant to the issues on appeal are:

> "With that operable sash and poured and debridged thermal breaks I do not see that system getting anywhere near the 0.38 whole window U value. As explained above, the operable sash is a complete short circuit, there is no thermal break at all!" (Emphases omitted.)

¶ 14    On November 8, 2014, Eljaciek sent a follow-up email stating, in part"

> "Operable windows will need to comply with \*\*\* ADA standards. \*\*\* I understand that US Aluminum says that they have agreed to modify the design to meet the ADA requirements. That leads me to believe that they currently do not have an operable window that meets this criteria. Does the project schedule allow enough time for the required modification and testing?"

"The hybrid system being proposed is NOT the 4500 system noted in [the earlier] e-mail. The 4500 system is a glazed aluminum curtain wall system—NOT a window wall system."

According to the email and the minutes of a subsequent meeting held on November 13, 2014, CGA and USA responded to the concerns raised in the original email, in part, as follows:

"Based on the discussion and decisions made at the meeting at [Architect's] office, the system was changed to the 4500 SSG Unitized System."

¶ 15 George Heflin, a sales manager for USA, responded to the email stating, in part, "The author below appears to be confused as to what we are providing. We have agreed with the design team to change the total system to the 4500 SSG Unitized Wall system."

¶ 16 CGA's owner, Abraham Asllani, attended a meeting on November 13, 2014, with Cody Stambaugh, who was then one of the project managers for the building. The minutes of that meeting reflect a discussion that CGA and USA "urgently need .DWG versions of the architectural drawings in order to complete the shop drawings. Tishman says these are forthcoming within one or two days." Asllani testified that the ".DWG drawings are a necessity for [USA's] shop drawings and engineering to get started. Asllani testified the meeting occurred on November 13 but the .DWG drawings were received around November 24, 2014.

¶ 17 At the end of December 2014 USA conducted "mockup testing" of the USA 4500 window system. Asllani testified that because "every project has its own unique characteristics *** what you want to do is put together a representation of the products that you are going to install to include specific conditions." The goal is to "actually perform *** air infiltration, water infiltration, and structural testing on that particular system to see if it works as configured the way that your job is going to be." Asllani testified the mockup testing of USA's 4500 system

"went good and bad." He explained, "[T]here were some tests that passed. But I do know that there was some failure. There was some water leakage."

¶ 18 Asllani testified that after the leak was detected Mark Meshulam, who Tishman had hired as a window consultant, "proceeded in providing USA what I perceived to be direction on modifications to the system to alleviate the issues that *** revealed themselves during testing." In a letter from Meshulam, Tishman's window consultant, to Eljaiek, senior project manager for the building, dated February 22, 2015, Meshulam wrote that during a "chat in a casual way" he "flipped through [USA's procedure manual for fabrication] and made some comments." He provided a copy of his markups to USA "at their request." Meshulam also wrote, "The following morning, John Frey[, USA's designer,] surprised me by saying that U.S. Aluminum "wanted to incorporate my ideas into their design of the windows for the [building.]" According to Meshulam's testimony he responded "it's too late *** to change anything."

¶ 19 In April 2015 a CGA employee, Weldon Liles, visited USA's manufacturing facility in Texas "to look at the progress of materials required for the mockup." Liles testified that all of the materials were not completed for the mockup at that time. He also testified there were some problems with the dies in that some of them were broken and would have to be reworked. Liles also observed that USA was using "the skip and debridged process that would have not been reflected in the approved products and drawings. Liles reported his observations to Asllani who responded CGA needed a thermal evaluation of the skipped and debridged product to "absolutely corroborate that it did not meet the project specifications."

¶ 20 CGA's April 27, 2015 email stated that upon receipt "it was noted that thermal break construction was not per the [building] project specifications requirements." The email explained that USA had used the "skip and debridged" process which "does not fully separate

the exterior metal from the interior metal components." The email stated the direct metal contact left over from the skip debridged thermal break "does not comply with the specifications" and concludes: "the Skip Debridge construction will need to be approved by the Design Team in order for Christopher Glass and Aluminum to proceed with the US Aluminum 4500 Series System." On May 1, 2015, CGA submitted a "substitution request" to Tishman asking to substitute "skip and debridge thermal break construction in lieu of fully pour and debridge thermal break construction." On May 4, 2015, Architect rejected the USA skipped and debridged mockup material because it did not meet the specifications. By then, Liles testified, CGA was already in discussions with Wausau Window and Wall, a different glass manufacturer other than USA.

¶ 21    Architect's May 4 rejection stated the substitution request was rejected because the substitution request did not explain why the change was requested and it "compromised the thermal performance of the wall but does not provide information on the extent of this compromise. The Architect cannot determine if this window wall will function to meet the code required and LEED-required thermal performance targets." At trial, Stephen Miller, an employee of Architect, when asked if as of May 15, 2015, "the US Aluminum 4500 system that was proposed by [CGA] and [USA] did not meet the project specifications," Miller testified, "The simulation of these three models did not meet the specifications."

¶ 22    On May 18, 2015, Nathan Baker, an Architect employee, emailed CGA and specifically Liles, stating "Please see attached reviewed submittal. 084413-23-US Alum. Thermal Reports for 4500T-4500TSG—Revise and Resubmit." Liles forwarded that email to Asllani and added, "Obviously US Aluminums (*sic*) product does not perform per specifications. Let me know how you want to proceed, before I send this report back." The tests failed to meet specifications and

Architect denied the substitution request, which Liles received on May 18. After thermal performance testing was performed Liles testified he received the report on May 18 and then informed Asllani the specifications were not met.

¶ 23   When asked if CGA was "still contemplating working with [USA] at that time, Liles responded:

"Well, as a project manager assigned to it, I have to look back at the contract. And the contract specifically said that we were required to provide the US Aluminum 4500 series, okay?

Now, I know we're having discussion with [Wausau Window and Wall]. Everybody is involved in it. But still this contract cannot be modified except by change order. So I have to still maintain the terms of the contract while we're proceeding or, you know, contemplating a way to fix this."

¶ 24   Cody Stambaugh, a former project manager for Tishman, testified he became involved with the building in August 2014. Stambaugh testified the project specifications required a "pour and debridged or fully thermally broken" system. USA "provided a skip debridge, which was noncompliant per the specification. And *** they own and need to comply with the project specifications." Tishman was first put on notice that the USA 4500 system would not meet the contract specifications via an April 22, 2015 email. However, they "did not know why it was noncompliant at that time." On April 28, 2015, Stambaugh emailed CGA to ask "if there is any modification of that material that [CGA] could do to make it compliant." Stambaugh testified the response was, in part, that CGA was "going to confirm the thermal modelling for the material used and that [CGA] cannot cut or modify that thermal break." Stambaugh stated this was another delay. Stambaugh testified regarding an email dated May 6, 2015, from USA in

response to the rejected substitution request. Stambaugh testified that in the email USA stated it would provide thermal simulations for the skip debridge design by May 12. Stambaugh testified those thermal calculations of the 4500 system did not meet the project specifications. Louis LeMieux, Owner's project manager, testified "there was a recommendation from Tishman for a replacement of the window system. He stated, "And they asked [Owner] if it was acceptable, and [Owner] allowed them to do that."

¶ 25    CGA's owner Asllani testified that on or about May 1, 2015, he had a meeting with Architect, Tishman, and Wausau Window and Wall. Asllani testified he set that meeting up because "Tishman had requested that I try and find an alternate supplier." The May 1 meeting was a result of that and Asllani introduced Wausau to "the team." LeMieux testified, "I believe there was something else that was submitted. I believe we had something, what they call a thermally improved system that was proposed rather than what we had originally wanted." LeMieux testified, "the initial shop drawings were incorrect *** and then the revised submissions were incorrect."

¶ 26    After the meeting, according to Asllani, "there was a change order that was presented to us for the change to Wausau." Asllani clarified CGA presented the initial change order request with a value then Tishman responded with a different value.

¶ 27    At trial, Asllani was asked, "What was the effect of the rejection of the skipped and debridged technology that was proposed by US Aluminum with the 4500 system? What did that mean?" Asllani answered, "It effectively ended our contract with Tishman on this project" because "[t]hey had asked us to utilize the United States Aluminum 4500 system exclusively, and here we are, we have it rejected." At that point, there was a discussion about trying to find a replacement and according to Asllani, Tishman and CGA "were working together to try to find a

solution." Asllani testified that his understanding of the relationship was that he had no contract at that time; however, he then testified that he "provided a change order to Tishman for an increased value on the Wausau system." He stated, "I did not have an obligation [under the contract.] My obligation was, try to renegotiate through the change order a new contract."

¶ 28    A May 2015 letter listed deficiencies and stated that Owner's building consultant and Architect had "provided additional significant guidance to [CGA] in an effort to expedite shop approval and minimize project delays instead of rejecting these deficient submittals." LeMieux testified that the letter also stated that prior resubmittals "failed to incorporate comments that were provided" by Architect and the consultant. LeMieux testified that in his experience, when shop drawings were not meeting the contract documents, and they had to be resubmitted multiple times, that would cause delay and it did cause delay in this case.

¶ 29    According to Cody Stambaugh, who was then one of the project managers for the building, CGA made the decision to switch to Wausau. Tishman did not direct CGA to switch to Wausau. Stambaugh testified his understanding of why the switch was made was "because of the rejected substitution request and subsequent *** failed thermal testing, that a change was required." He agreed that the proposed system that Tishman had been told would meet the project specifications did not meet the project specifications.

¶ 30    Stambaugh testified mockup testing of the Wausau system also failed. On June 23, 2015, Stambaugh sent CGA a letter stating it was "in response to multiple correspondences *** and items as detailed below causing continued delay to the project." Listed in the letter were (1) shop drawings for the new Wausau window wall system, (2) mockup testing of the Wausau window wall system, and (3) a purchase order for material release. Regarding the last item, Stambaugh wrote: "[Tishman] does acknowledge the concern of CGA to release materials

without a passed mock-up test however it is [Tishman's] assertion that this failure should not hold back the release of the most, if not all of the materials/extrusions." Stambaugh testified neither he nor was he aware of anyone at Tishman directing a change in window systems.

¶ 31 David Veronesi, a general superintendent at CGA, testified as to several items that had to be completed in the building construction by "[a]ny body that has to be in before us" as of November 4, 2015 before CGA could install windows. He described these trades as his "predecessors." He also testified that CGA's shop drawings do not affect the work of his predecessors. Veronesi testified that as of October 20, 2015, the air and vapor (A/V) barrier had yet to be painted which has to be done before CGA can install the sills. He stated you cannot install windows from the bottom up while subcontractors are "doing their EIFS work" from the top down "because you have got men working on swing stages below." Veronesi testified based on a photograph of the third floor on October 27, that floor was not ready for window installation "because of all of the heads."

¶ 32 Veronesi also testified that as of November 4, 2015, CGA did not have windows to install in the building. He further testified, however, that CGA had product on the job site; specifically, "sill track and head track loaded on the floor waiting for Tishman to complete chipping of their concrete and getting their AV barrier installed." CGA also had a hoist on the 20th floor. He agreed that "everything was in place but delivery of the glass and the products." Liles testified that as of the end of October to the first week of November CGA had "project material" in stock which includes aluminum extrusions, glazed vent windows, starter track, and "four floors of frame material;" and the "glass for the first nine floors was being produced *** and was scheduled for delivery on or about 11/7." CGA could have begun installation of the glass on the first nine floors of the building "[u]pon receipt of the glass with a few days of production."

Specifically, CGA "should have been able to be on the job on or about second or third week of November."

¶ 33    CGA sought additional compensation from Tishman based on the switch to the Wausau system. Thalheimer, executive vice-president and regional manager at Tishman, testified that he discussed that request with Asllani. Thalheimer stated he initially took the position that "it was [Thalheimer's] opinion that there was no change in scope whatsoever, and that in fact [CGA] has [its] obligations to meet with respect to the performance criteria and the aesthetics, and if [CGA] couldn't meet it with his proposed system, he could propose another system that would meet those obligations, but [it] still had to maintain [its] other obligations with respect to cost and schedule." The parties were unable to reach an agreement on additional compensation.

¶ 34    On August 18, 2015, Stambaugh wrote CGA in response to CGA's response to an earlier correspondence from Tishman to CGA. Tishman had posed certain questions to CGA regarding items that were then "causing continued delay to the project schedule" and CGA had responded, followed by Tishman's August 18 requests for clarification to CGA's responses. One such question asked if the "first run of parcels" would be ready for installation on September 2, 2015. CGA responded they would be ready "approximately 9/28." Tishman's August 18 letter states, "this is an approximate three week delay to the critical path of the job with no explanation provided." Another response from CGA was that "slab edge covers" would begin to be installed on September 8. Tishman clarified, "This will most likely fit within an acceptable timeframe; however it is important to point out that the date fell behind from previous commitments."

¶ 35    On September 15, 2015, Liles wrote to Tishman requesting a clarification on how it was to proceed with an installation. Liles's letter stated CGA had discovered "multiple deviations of floor heights and slab edge distances on the portion of the building we have surveyed to date."

In that letter CGA also alerted Tishman that CGA "required an equitable monetary adjustment of all current and any future hours expended in" surveying openings.

¶ 36     On September 25, 2015, CGA submitted a change order request to Tishman.  The letter states that "working control lines have been marked incorrectly throughout the building."  The letter states CGA had expended over 800 field hours surveying and marking openings and incurred additional expenditures.  The letter states CGA would "cease all operations in reference to the layout of the window wall materials" and operations would "resume once Tishman Construction has reestablished and confirmed in writing the locations of the control line we are to work from for the balance of the project."  The letter lists the additional time spent and sought "an equitable adjustment."

¶ 37     At trial, Tishman's scheduling expert testified there were in fact delays to the completion of the control lines on the project but those delays did not make it on the "critical path" to affect the end date for completion of the project.  He explained, "those control line delays, which were discovered in September and October of 2015, were clearly resolved by the time the windows showed up at the site, because windows immediately started to be installed.  So they were not on the critical path, once again, a delay that did not affect the end date."

¶ 38     CGA employee Weldon Liles testified that based on the materials he had, CGA would "have been able to be on the job on or about second or third week of November."  He also testified that CGA had performed some work prior to November 2, but had "hit problems on or about the 4th, 5th floor where we couldn't complete [installing sill receptors and head receptors] based on our survey and the corrective actions that Tishman had to perform."

¶ 39     On October 27, 2015, Tishman wrote a letter to CGA stating it was a "Final Demand for Recovery Schedule and Remedial Measures."  The letter states it was "final notice of [Tishman]

to [CGA] that CGA has failed to comply with material provisions of the [contract.]" The letter states that if CGA failed to take remedial measures stated in the letter Tishman would exercise the remedies available to it under the contract. Among the remedial measures was a "resource and manpower-loaded recovery schedule," a recovery plan pursuant to section 25 of the parties' contract, "even if (a) CGA considers itself not to be in delay, (b) CGA considers delay not to be its responsibility, and/or (c) CGA considers itself to be entitled to an extension of time." The letter states that if CGA fails to comply Tishman has the right to terminate the contract. Stambaugh testified CGA responded to its request but the response was not within the 72-hour timeframe requested. Stambaugh also testified CGA did not provide a "man-loaded recovery schedule" as requested.

¶ 40    On November 2, 2015, Tishman sent CGA a notice of default and termination.

¶ 41    CGA called Joseph Manzi to testify as an expert witness. Manzi opined the delays CGA experienced were not caused by CGA. He further stated he did not find any issues where CGA "could be viewed as the delaying factor." Manzi testified he did not think CGA "was responsible for even a single day of critical path delay on this project." He further testified, however, that, "by definition" defects in the USA glass system caused delay to the project's critical path.

¶ 42    CGA called James Schmid as an expert witness to "quantify damages" and "look at damages suffered by Christopher Glass." As part of his analysis Schmid conducted an analysis pursuant to section B of paragraph 27 of the contract and concluded there was a certain amount of actual costs CGA incurred as a result of the alleged breach of the contract.

¶ 43    Tishman called Richard Sieracki to testify as an expert on "the causes of delay on the project and the responsibility for that delay, the damages incurred by Tishman as a result of the

delay, and then also as a rebuttal witness to two of the experts called by [CGA]." Sieracki testified the completion of the building project "was 249 days later than planned." Sieracki opined that "based on the analysis performed by myself and my team, Christopher Glass was responsible for 179 days or 72% of the delay on the project." Sieracki criticized CGA's expert's opinion because "he did not perform an independent critical path schedule analysis." Instead, "What he did, *** he identified several events of delay on the project. But he has no opinion as to whether those events were on the critical path, and he did not quantify any of the delay associated with those events." Sieracki testified that "the critical path is really the activities and the logical relationship between the activities that drive when the project can be completed. And if there is a delay on the critical path, the project will be delayed."

¶ 44    Sieracki admitted not all of the delays on the project were caused by CGA but testified Tishman was not seeking damages for those delays that were not caused by CGA.

¶ 45    According to Tishman's damages expert, when including amounts paid to other subcontractors to accelerate their work to minimize the delay, the higher cost of replacing CGA with other subcontractors, nearly $1 million in liquidated damages paid to Owner in light of the delay, and extended overhead costs, Tishman incurred $16,432,994 in damages arising from CGA's alleged default.

¶ 46    Any additional information from the proceedings below that is necessary to our disposition of the issues on appeal will be provided in context.

¶ 47    Following trial, the circuit court of Cook County entered judgment in favor of CGA and against Tishman on CGA's claim against Tishman for breach of the parties' contract. The court also found in favor of CGA and against Tishman on Tishman's counterclaim for, *inter alia*, breach of contract and indemnification for delay costs. The court awarded damages, pursuant to

Article 27(b) of the parties' contract, for the actual costs incurred with a reasonable markup for profit. The court ruled CGA is not entitled to its lost profits. The court entered judgment for CGA for $1,598,436.

¶ 48    This appeal followed.

¶ 49                               ANALYSIS

¶ 50                            A. Tishman's Appeal

¶ 51    Tishman appeals the trial court's judgment as to damages in that the judgment failed to consider or award damages to Tishman arising from project delays caused by CGA. "[A] plaintiff is entitled to recover damages under a contract theory only to the extent provided by the terms of the written instrument." *Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶ 102. The construction of a contract presents a question of law subject to *de novo* review. *Westfield Insurance Co. v. West VanBuren, LLC*, 2016 IL App (1st) 140862, ¶ 11.

¶ 52                    Applicability of the *Spearin* Doctrine

¶ 53    Tishman argues the trial court's error arose from the court's misapplication of "the *Spearin* doctrine." In *U.S v. Spearin*, 248 U.S. 132 (1918), the United States Supreme Court held that "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. *** This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work, *** the contractor should be relieved if he was misled by erroneous statements in the specifications." *Spearin*, 248 U.S. at 136. "Illinois law is also supportive of and, in fact, predates the principle enunciated in *Spearin*. In *Clark v. Pope*, 70 Ill. 128 (1873), it

- 18 -

was established that a contractor who builds according to plans and specifications furnished to him and performs the job in a good and workmanlike manner is protected and such contractor will not be responsible for the consequences of defects in such plans and specifications." *W. H. Lyman Construction Co. v. Village of Gurnee*, 84 Ill. App. 3d 28, 37 (1980).

¶ 54     Tishman argues the *Spearin* doctrine does *not* apply in this case because (1) CGA proposed the USA 4500 system as able to perform as the specifications required and (2) the product CGA provided differed from what both the specifications and the contract required. Tishman also argues that, consequently, the substitution of the USA 4500 system with the Wausau system resulted from CGA's failure to supply the system required by the subcontract (a breach for which CGA is responsible absent application of the *Spearin* doctrine); therefore, the delays and additional costs associated with the substitution must be attributed to CGA and not to Tishman.  Tishman asserts that it incurred approximately $16.4 million in damages arising from CGA's "default" based on project delays CGA caused.

¶ 55     Under *Spearin*, "we are presented with a question of law whether the evidence was sufficient to establish such a claim for damages." *Asset Recovery Contracting, LLC*, 2012 IL App (1st) 101226, ¶ 101.  However, "the factual findings that inform the [decision on questions of law] are given deference on review and are to be reversed only where they are against the manifest weight of the evidence.  [Citation.]  A factual finding is against the manifest weight of the evidence if the opposite conclusion is plainly evident, or where the decision is unreasonable, arbitrary or without a basis in the evidence.  [Citation.]" *Id.* ¶ 74.  Where the trial court must decide a legal question on the basis of the record our standard of review is *de novo*.  *Westfield Insurance Co.*, 2016 IL App (1st) 140862, ¶ 11.

- 19 -

¶ 56     After carefully reviewing the trial court's written judgment, we find that the trial court made several "factual findings that inform the [decision on questions of law]." *Asset Recovery Contracting, LLC*, 2012 IL App (1st) 101226, ¶ 74.  That "question of law" being whether or not the *Spearin* doctrine applies in this case.  See *Patargias v. Coca-Cola Bottling Co. of Chicago*, 332 Ill. App. 117, 126 (1947) ("Whether or not there was an implied warranty by the defendant to plaintiff under the facts and circumstances in evidence presented a question of law.").  We will accord appropriate "deference on review" to the trial court's factual findings and reverse "only where they are against the manifest weight of the evidence." *Id*.

¶ 57     Tishman first agues the *Spearin* doctrine does not apply because three key elements are missing.  First, the trial court's finding that the plans and specifications required CGA to deliver and install specifically the USA 4500 system is against the manifest weight of the evidence.  In support of that contention Tishman argues Sadowski "never said that;" and Meshulam testified the plans and specifications did not mention the USA 4500 system.  Tishman admits "[t]he requirement for using the 4500 system was in the subcontract" but argues *Spearin* does not apply because use of the 4500 system was "not in the specifications."  Second, the design itself was not defective.  The problem arose because CGA "did not deliver the product Tishman purchased." Tishman argues it "purchased a window system that was *described* as complying with the specifications."  (Emphasis added.)  Tishman further argues, in effect, that it was entitled to rely on USA's and CGA's representations that the 4500 system "was thermally broken, with a maximum 0.38 U-value" because "[t]here was no evidence that an architect has the duty (or ability) to test or evaluate whether the manufacturer's description of its own product is accurate." Third, the requirement that CGA deliver and install a window system that was thermally broken

with a maximum 0.38 U-value was a performance specification rather than a design specification and *Spearin* only applies to design specifications.

¶ 58     Additionally, Tishman argues the contractual requirement for using the USA 4500 system resulted from CGA's proposal to Tishman and Owner that the system would comply with the specifications.  Tishman argues that "[w]here the product a contract requires the contractor to use originates with the contractor's own proposal to comply with the specifications, the *Spearin* doctrine's logic no longer applies."  On the contrary, citing *Unites States v. Wegematic Corp.*, 360 F.2d 674, 676-77 (2d Cir. 1966), Tishman argues that "when a purchaser chooses a product based on the seller's representation that it will perform as required, the seller, not the purchaser, bears the risk of nonperformance."  Then, those representations negate applicability of the *Spearin* doctrine.

¶ 59     CGA responds Tishman breached the contract by mandating it use a window system that "was ultimately determined to be unusable on the project."  CGA argues precontractual statements should not be considered because the contract is clear and unambiguous and because the contact contains an integration clause.  See *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999).  CGA asserts the contract unambiguously required CGA "to furnish and install only one type of specific system—the US Aluminum 4500 system."  CGA notes, rather astutely, that Tishman chose not to include language in the contract such as "equal," or "equivalent," or "of comparable quality" to the 4500 system, so CGA was given no discretion to select a different system of equal or equivalent quality and price.  CGA argues the decision not to include those terms or the like "should be given the purpose and effect the parties intended—[CGA] was to use only the US Aluminum 4500 system on this project."  CGA argues that the use of the word "exclusively" supports this interpretation; and the contract "expressly

- 21 -

incorporated the project plans and specifications" which instructed CGA to furnish and install the US Aluminum 4500 system. Thus, there is no "latent ambiguity" in the contract. Moreover, because Tishman drafted the contract any ambiguity must be strictly construed against it. *Mitchell v. Jewel Food Stores*, 142 Ill. 2d 152, 163 (1990) ("ambiguous contractual language is generally construed against the drafter of the contract"), see also *Vandenberg v. RQM, LLC*, 2020 IL App (1st) 190544, ¶ 47, citing *Brian Properties, Inc. v. Burley*, 278 Ill. App. 3d 272, 274 (1996) (noting both that "[t]he terms and provisions of [a contract] may not be construed in a manner that is contrary to the plain and obvious meaning of the language used," and "[w]hen a contract is drawn, it is construed against the drafter").

¶ 60    The parties' contract contains an integration clause that reads as follows: "This Agreement is complete and shall not be interpreted by any reference to any previous bid, letter, proposal, document or understanding, written or oral, or other document or agreement except as specifically provided in this Agreement." CGA argues Tishman's reliance on any precontract proposal or statements by CGA should be disregarded on appeal under the four corners rule. "Where an integration clause is included in an agreement, the four corners rule applies and extrinsic evidence is not admissible to interpret the agreement." *In re Marriage of Lewin*, 2018 IL App (3d) 170175, ¶ 13, citing *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 522 (2001).

¶ 61    Tishman argues parol evidence is admissible to determine, not what the contract means but, instead, whether the *Spearin* doctrine applies. Tishman argues, "[a]nd to answer that question, the court needs to know whose idea the 4500 system was and why it was chosen." Alternatively, Tishman argues the *Spearin* doctrine does not apply because CGA failed to actually comply with the specifications it was required to follow. Tishman argues that the contract required CGA to provide the USA 4500 system "which was described in the Trade

Specific Statement of Work as meeting the design criteria in the specifications;" but what it received was not the USA 4500 system embodied in the subcontract: the one that was fully thermally broken with a maximum 0.38 U-value—the one CGA was required to deliver and install.

¶ 62    As evidence of this, Tishman points to CGA's admitted surprise upon learning the USA 4500 system used a skip debridged thermal break and its subsequent request for a change order to a skip debridged thermal break construction instead of a fully pour and debridge thermal break construction.  Tishman reasons, "[i]f a skip debridged product was what it had sold to Tishman, there would have been no need to seek approval for a substitute."  Tishman asserts the subcontract required use of a specific window system—the USA 4500 (with fully pour and debridge thermal break and less than 0.38 U-value)—but CGA did not supply it.  Tishman argues the *Spearin* doctrine does not protect CGA because it "did not adhere without deviation to the design specifications or the subcontract's scope of work."  (Emphasis omitted.)  Tishman reasserts that the *Spearin* doctrine does not apply in this case because CGA "represented [the USA 4500 system] would comply with the project specifications" and that the delay in the project is attributable to CGA because "CGA attempted to supply a different system that did not conform to the subcontract."

¶ 63    Tishman's basic premises to all of its arguments are:

> (1) *Spearin* does not apply where the party seeking its benefit proposed, and the other party relied upon and accepted, the product to be used and the product fails to perform as specified.  Thus, Tishman argues, the trial court "erred in failing to consider CGA's proposal and applying *Spearin* to absolve CGA of its breach."

Rather, "CGA's proposal [which specified the 4500 system] entirely negates *Spearin*'s required premise;" and,

(2) "[A] contractor cannot complain of defects in the *contractual* requirements if it fails to follow them." (Emphasis added.) Here, Tishman argues "the *plans and specifications* did not require use of the 4500 system."

For the reasons explained below, both assertions are false and the trial court's finding to the contrary is not against the manifest weight of the evidence.

¶ 64 The record shows CGA did not attempt to supply a *different* system that did not conform to the subcontract—CGA attempted to supply the system required by the subcontract: the USA 4500 system. ("The testimony was that Mr. Meshulam participated in an attempt to customize the product to conform to the needed specifications.") By requiring the USA 4500 system Tishman impliedly warrantied it would perform to specifications; that it did not cannot be attributed to CGA. CGA's "representations" to the contrary, if made, are irrelevant; and, contrary to Tishman's arguments, those representations are inadmissible.

¶ 65 We first address Tishman's argument *Spearin* does not apply because the "requirement for using the 4500 system is found in the subcontract not the specifications." Tishman cites no authority for that proposition nor do we find it tenable. In *Spearin*, the provider "contracted [to perform] *** in accordance with plans and specifications which had been prepared by [the customer.]" *Spearin*, 248 U.S. at 133. Nowhere in *Spearin* did the United States Supreme Court mention or rely upon whether the requirement in question was written in the plans and specifications or in the contract itself. There exists no condition on the rule that the required action be in the plans for the work provided to the contractor or in the contract to perform

- 24 -

according to the plans. The basis of the court's holding is that the contractor should be relieved if he was misled by what he was required to do.

¶ 66    In this case, the specification that formed the basis of the parties' contract was to:

"Furnish and install all Glazed Aluminum Curtain Walls system as manufactured by [USA] for all systems, fully operational meeting design criteria provided in the specifications and shown on drawings. The approved system is the [USA's] structurally glazed (4500) system to be used exclusively for the main building's glass systems modified, where required, with the structurally adhered external aluminum components."

That the requirement that CGA furnish and install the USA 4500 system was in the contract rather than "plans and specifications" is a distinction without a difference. Moreover, we believe the fact the requirement is in the contract makes a stronger case in favor of CGA. See *Air Safety, Inc.*, 185 Ill. 2d at 464. We reject Tishman's argument the *Spearin* doctrine does not apply to shield CGA from liability arising from the selection of the USA 4500 system for the specific reason that that requirement is not in the "plans and specifications" for the building project.

¶ 67    Next, we turn to Tishman's argument *Spearin* does not apply where the party seeking its benefit proposed, and the other party relied upon and accepted, the product. In support of its position Tishman begins by asserting that three elements must be present for *Spearin* to apply, the first being that "the plans and specifications on which the contractor relied were prepared by or for the Owner" but here they were not. Instead, "the subcontract's requirement for the 4500 system resulted from CGA's proposal to Tishman and the Owner that the 4500 system would comply with the performance specifications." As authority for its proposition Tishman cites *Bethlehem Corp. v. United States*, 462 F.2d 1400 (Ct. Cl. 1972) on the basis that allegedly, the

*Spearin* doctrine was held inapplicable in that case because the government had requested bids from manufacturers to furnish a product that would perform according to specifications, the contractor did so, and the contractor should be held to have assumed the risk of nonperformance. Tishman also relies upon *United States v. Wegematic Corp.*, 360 F.2d 674 (2d Cir. 1966), and *Austin Co. v. United States*, 314 F.2d 518 (1963), both relied upon by the *Bethlehem Corp.* court and the latter of which the *Bethlehem Corp.* court ultimately distinguished.

¶ 68     The court's decision in *Austin Co.* does not say or imply the plaintiff/contractor in *Austin Co.* was misled into performance or relied on anything the "owner" said.  See *Austin Co.*, 314 F.2d at 520-21.  The same is not true here.  While CGA may have suggested or even vouched for the USA 4500 system, it did not overtake creation of the specifications or selection of the system like the contractor did in *Austin Co.*  CGA did not tell Tishman it needed to build its window wall system differently; CGA did not tell Tishman what kind of thermal break to use in its window wall system; CGA did not tell Tishman its window wall system needed a less than 0.38 U-value when Tishman would have accepted less.  The parties conferred with the manufacturer of the system; then Tishman, a sophisticated party with the ability to understand the information it was provided, wrote a contract specifying CGA use the USA 4500 system exclusively.  CGA "suffered losses by reason" of that specification by Tishman—not by a specification it imposed upon itself.  *Cf. id.*

¶ 69     We also find that the circumstances in *Bethlehem Corp.*, which resulted in the government issuing specifications drafted and amended by the contractor before bidding on the contract (see *Bethlehem Corp.*, 462 F.2d at 254 n1), are distinguishable from the circumstances surrounding the requirement that CGA deliver and install the USA 4500 glass system for exclusive use in the window wall system.  Initially, there is evidence that USA, not CGA,

assured Tishman the USA 4500 system would perform to specifications. More importantly, however, neither CGA nor USA possessed superior knowledge to Tishman. Tishman knew exactly what they wanted and Tishman knew what they wanted was available on the market. Tishman was intimately involved in preparing the specifications and selecting the USA 4500 system having met with representatives from the window manufacturing company and discussing the performance and design requirements for the window wall system. *Cf. id.* at 254. Tishman initially rejected a bid using the same Wausau system it ended up with, apparently due to its cost.

¶ 70    As stated above, the question in these cases is reliance on representations—who makes them, can they be reasonably relied upon, and who assumes the risk of them. In *Bethlehem*, the plaintiff made the representation that the test chamber could be built (it could but the testing the government required needed two chambers and Bethlehem only had one) and the government, given the fact it had "very little competence concerning the state of the art or knowledge of what equipment might be available to simulate the necessary environment" (*Bethlehem Corp.*, 462 F.2d at 1401), could reasonably rely upon the plaintiff's representations without impliedly warranting their veracity. See *id.* at 254. Further, Tishman could have easily avoided *Spearin* liability by simply writing its contract to require CGA to deliver and install a window system with a fully pour and debridge thermal break and a less than 0.38 U-Value. Full stop. It did not. It chose to not only state that the "approved" system was the USA 4500 system but took the additional step of saying the USA 4500 system was to be used "exclusively." We have no authority to relieve Tishman of its contractual choice. See, *e.g., Hollerbach v. U.S.*, 233 U.S. 165, 172 (1914) ("If the government wished to leave the matter open to the independent

investigation of the claimants, it might easily have omitted the specification as to the character of the filling back of the dam.").

¶ 71    On appeal Tishman added the argument that although the trial court found CGA's representations about the USA 4500 system were not actionable false statements the court did not provide a "rationale for disregarding CGA's express representations about the characteristics of the system it was selling" in determining whether *Spearin* applies.  Tishman argues "those representations, as in *Wegematic*, negate applicability of the *Spearin* doctrine."  We disagree.

¶ 72    The resolution in *Wegematic Corp.* can most readily be explained as an examination of the reasonableness of reliance on a misrepresentation in the formation of a contract and which party should bear the risk of loss from that misrepresentation.  See *Wegematic Corp.*, 360 F.2d at 676 ("question of how much risk the promisor assumed").  The court noted that if a party wanted to be relieved of the risk of nonperformance, "the appropriate exculpatory language is well known and often used."  *Id.*  In this case, the language of the parties' contract does not contain any of the well-known exculpatory language that might have relieved Tishman of the risk that its designated window system would fail.  As pointed out by CGA on appeal, CGA "was not given any discretion whatsoever in selecting a different system of equal or equivalent quality and price and Tishman did not include the term "or equal" in its contract."  See generally *Gage v City of Chicago*, 207 Ill. 56 (1903) (discussing ordinance with "equal in quality" language).

¶ 73    Moreover, the USA 4500 system was not touted as a breakthrough system, the only of its kind with a fully pour and debridge thermal break and a U-value less than 0.38.  Tishman was in fact presented with multiple systems it could have chosen from.  Tishman undoubtedly made its choice based on the attractiveness of certain representations about the USA 4500 system.  Nonetheless, CGA did not assume the risk of nonperformance of that system, even if it did make

the representations.  The representations did not involve risky promises of a "revolutionary

breakthrough."  See *Wegematic Corp.*, 360 F.2d at 676.  Rather, all indications are that the

representations were that the USA 4500 system was a system that could give Tishman what it

wanted at a lower cost than other systems that could do the same thing.  *Cf. id.*  When Tishman

made its election and stated it unequivocally in the contract it wrote, it assumed the risk of

nonperformance, not CGA.  *RQM, LLC*, 2020 IL App (1st) 190544, ¶ 47.

¶ 74    Tishman relatedly argues the parol evidence rule does not apply in this case for purposes

of determining whether the *Spearin* doctrine applies, asserting "*Spearin* itself rejects

applicability of the parol evidence rule."  True, the *Spearin* court found "the parol evidence rule

[does not] preclude[] reliance upon a warranty implied by law."  *Spearin*, 248 U.S. at 138, citing

*Kellogg Bridge Co. v. Hamilton*, 110 U.S. 108 (1884).  But *Kellogg Bridge Co.* did not involve

application of the parol evidence rule or in any way discuss the parol evidence rule.  See *Kellogg*

*Bridge Co.*, 110 U.S. 108.  The *Kellogg Bridge Co.* court did note, however, that the trial court

had "instructed the jury *** that by the contract—looking at all the circumstances attending its

execution and giving to its terms a fair and reasonable interpretation—there was an implied

warranty ***."  *Kellogg Bridge Co.*, 110 U.S. at 111.  We believe this was the language—

specifically, that courts are to consider all of the circumstances attending the execution of a

contract when determining whether there was an implied warranty—upon which the *Spearin*

court based its statement that the parol evidence rule does not preclude reliance upon a warranty

implied by law.  *Spearin*, 248 U.S. at 137-38.

However, in making this argument, Tishman does not address the integration clause in the

parties' contract.  "An integration clause such as the one in the present case is a clear indication

that the parties desire the contract be interpreted solely according to the language used in the

final agreement.  Consequently, we will not write the integration clause out of the contract ***.”

*Air Safety, Inc.*, 185 Ill. 2d at 465.  The contract in this case is not facially ambiguous.  “[T]he

four corners rule precludes the consideration of extrinsic evidence where a contract contains an

integration clause and is facially unambiguous.”  *Id.* at 466.  Nonetheless, Tishman relies on

*Economy Fuse & Manufacturing Co. v. Raymond Concrete Pile Co.*, 111 F.2d 875 (7th Cir.

1940), and *Lathrop-Paulson Co. v. Perksen*, 229 Ill. App. 400, 403-04 (1923), in support of its

argument the trial court erred in failing to consider CGA’s alleged representations about the USA

4500 system before the parties entered the contract.  Neither case leads this court to find the trial

court’s judgment is erroneous.  Both cases are inapposite because they contain no discussion of

the effect of an integration clause.  Here, the trial court properly held that “any prior discussion

regarding the use of the system merged into the agreement.”  “When the intent of the parties is

unambiguously expressed in the contract, that expression controls, and the court’s inquiry should

proceed no further.”  *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 443 (2015) (Justice

GINSBURG, with whom Justice BREYER, Justice SOTOMAYOR, and Justice KAGAN join,

concurring.).

¶ 75    The trial court properly applied the *Spearin* doctrine in this case.  Tishman contracted

with CGA expressly to deliver and install the USA 4500 system “to be used exclusively for the

main building’s glass systems.”  CGA was “bound to build according to [the] specifications” for

the delivery and installation of the USA 4500 system “prepared by the owner;” therefore, CGA

“will not be responsible for the consequences of defects in” that system.  *Spearin*, 248 U.S. at

136.  The USA 4500 system did not use a fully pour and debridge thermal break and could not

achieve a maximum U-value of 0.38 as Tishman desired.  But, contrary to Tishman’s argument,

CGA’s failure to deliver a product that met those requirements was not attributable to CGA

based on the unambiguous language of the parties' contract. Any damages resulting from the USA 4500 system's inability to perform to Tishman's specifications are attributable to Tishman, which impliedly warranted to CGA that if CGA delivered and installed the USA 4500 system it would be sufficient.

¶ 76    Finally, Tishman argues *Spearin* does not apply because CGA did not provide the product is was required to provide. According to Tishman, CGA was required to deliver and install a USA 4500 glass system with fully pour and debridge thermal break and a maximum U-value of 0.38, but "what CGA received from USA[] in April 2015 *** was not thermally broken and therefore could not meet the maximum 0.38 U-value;" and, therefore, "was not the system Tishman bought and that CGA was required under the subcontract to furnish and install." Tishman also argues CGA attempted to provide something the parties did not contract for as evidenced by the fact "the sample parts obtained by CGA from [USA] in April 2015 were not what the subcontract required" in that those materials did not have a continuous thermal break and the "skipped and debridged thermal break did not conform with the specifications."

¶ 77    The materials CGA received from USA did not conform to the specifications because the USA 4500 system Tishman mandated did not conform to the specifications, not because CGA "attempted to provide something else," as Tishman claims. There is record evidence and Tishman concedes CGA was just as surprised at this development as was Tishman. On appeal Tishman admits "CGA expressed surprise at that development, stating that it 'was never informed that the Project Window Wall would have a Skip Debridged Construction.' " Tishman inconsistently argues that "[t]he '4500 system' required by the subcontract was not an ever-changing product that was whatever [USA] or CGA chose to label '4500 system' at any given time" while also arguing that the system CGA attempted to provide "was not the 4500 system to

which Tishman and CGA had agreed in the subcontract." (Emphasis omitted.)  Tishman asserts—without citation to the record, any evidence from which the fact might be inferred, or any basis whatsoever—that at some time and for some reason (which they also fail to articulate), CGA or USA or both (Tishman doesn't say) *changed* the system.  To wit: "Nor could the parties possibly have intended that [USA] was free to change the 4500 system's key required characteristics after the subcontract requiring its use was signed.  *** [T]he system CGA presented to Tishman in April 2015 did not satisfy the specifications because it was a changed system."  Therefore, Tishman argues, CGA did not adhere without deviation to the design specifications and the implied warranty does not apply.

¶ 78     "[T]he contractor must fully comply with and follow the design specifications, although faulty, to enjoy the protections of the implied warranty, unless the departure from the specifications is 'entirely irrelevant to the alleged defect.'  [Citations.]"  *Travelers Casualty & Surety of America v. United States*, 74 Fed. Cl. 75, 89-90 (2006).  "Design specifications require that a contractor strictly to adhere to specification, with no deviation or modification."  *C.H. Guernsey & Co. v. U.S.*, 65 Fed. Ct. Cl. 582, 605 (2005).  Therefore, an implied warranty attaches that the specifications are free from design defects.  See *White v. Edsall Construction Co., Inc.*, 296 F.3d 1081, 1084 (Fed. Cir. 2002) (" 'This implied warranty attaches only to design specifications detailing the actual method of performance ***.  Because the implied warranty protects contractors who fully comply with the design specifications, contractors are not responsible for the consequences of defects in the specified design.' ***.").

¶ 79     Initially, we hold the trial court correctly found CGA "was required to follow the contract as a whole without deviation."  "Generally, there must be strict compliance with the contract's terms."  *Pacini v. Regopoulos*, 281 Ill. App. 3d 274, 279 (1996), *Iron Workers Tri-State Welfare*

*Plant v. Carter Construction, Inc.*, 530 F. Supp. 2d 1021, 1026 (ND Ill. 2008) (contracting party

has a "duty to strictly comply with the contract terms"). We find no indication in the record of

either an express or implied waiver of the contract term requiring CGA to deliver and install the

USA 4500 window system. See generally *Mendelson v. Ben As. Borenstein & Co.*, 240 Ill. App.

3d 605, 616-17 (1992) (discussing waiver of strict adherence to a contract's technical

requirements). Therefore, we find that the specification at issue, specifically the use of the USA

4500 system exclusively, constitutes a design specification rather than a performance

specification. See *Fireman's Fund Insurance Co. v. United States*, 92 Fed. Cl. 598, 652 (2010).

¶ 80    Next, we find Tishman's argument that it was CGA that attempted to deliver a "changed"

USA 4500 system and it therefore failed to "strictly to adhere to specifications, with no deviation

or modification," is completely unsupported by the record and, therefore, forfeited. *Wells Fargo*

*Bank, N.A. v. Sanders*, 2015 IL App (1st) 141272, ¶ 42 ("defendant's argument *** is

unsupported by the record and, thus, forfeited"), *Lopez v. Northwestern Memorial Hospital*, 375

Ill. App. 3d 637, 648 (2007) ("When an appellant seeks reversal, theories presented without

authority are deemed waived, and the reviewing court should not search the record for reasons to

reverse the trial court's judgment. A reviewing court is entitled to have the issues clearly defined

with pertinent authority cited and is not simply a depository into which the appealing party may

dump the burden of argument and research.").

¶ 81    Tishman has pointed to no evidence anyone actually changed the USA 4500 system other

than it was not what certain individuals may have said it was. Either the USA 4500 system is a

customizable system CGA customized incorrectly, or it is not. Either the USA 4500 system can

have or can be made to have a fully pour and debridge thermal break or a skipped and debridged

thermal break (at whose election it was the latter in this case, Tishman does not speculate) or the

USA 4500 system has a skipped and debridged thermal break and it did so when Tishman contracted to purchase it—any claims to the contrary notwithstanding. Tishman admits CGA was surprised upon learning the USA 4500 system USA was manufacturing had the characteristics it did. Second, when it was discovered by CGA and Tishman, the parties discussed changing to a completely different system, the 4500 SSG Unitized System. After a meeting with Tishman's glass expert, USA discussed modifying the USA 4500 system (not, we note, correcting it or returning it to its original design) to meet Tishman's requirements. This would have required changes to the window system. If the USA 4500 system had a fully pour and debridge thermal break when Tishman bought it those changes would not have been necessary. We cannot even find that the trier of fact could reasonably infer USA and CGA were cutting corners to save money and increase their profit on the contract because Tishman has not directed us to any record evidence the skipped and debridged thermal break compared to the fully pour and debridge thermal break construction or better UV ratings possibly achieved those results.

¶ 82     There is also evidence in the record to support the trial court's factual determination that *Tishman's glass expert* participated in a post-contractual discussion with USA to attempt to customize the USA 4500 system to conform to Tishman's needs. Tishman claims any direction Meshulam provided related only to water leakage and not to the thermal break design or U-value. However, Tishman also concedes Asllani testified Meshulam was involved in discussions surrounding "undefined changes" and that Meshulam and USA discussed "a *variety* of changes." (Emphasis added.) We note that it was the province of the trier of fact to consider all of the testimony and evidence *and to draw reasonable inferences therefrom. Maple v. Gustafson*, 151

Ill. 2d 445, 452-53 (1992). Tishman's attempt to parse the evidence is not persuasive against our conclusion.

¶ 83    Forfeiture aside, the evidence is to the contrary. See also *supra*, ¶¶ 18-26. "Whether we might have reached the same conclusion is not the test of whether the circuit court's factual finding is against the manifest weight of the evidence, the appropriate test is whether there is any evidence in the record to support its finding." *Aliano v. Sears, Roebuck & Co.*, 2015 IL App (1st) 143367, ¶ 12. The trial court's factual findings (*e.g.*, "It was not suggested that the manufacturer suggested that the system was anything but what it was represented to be.") are not against the manifest weight of the evidence. Accordingly, we hold the trial court's judgment that "Tishman made the choice of a window system that would not allow [CGA] to satisfy the performance specifications" is not against the manifest weight of the evidence, and is affirmed.

¶ 84                                        Project Delays

¶ 85    We now turn our attention to Tishman's argument the trial court's judgment that project delays are not attributable to CGA is against the manifest weight of the evidence. "On review, this court will not reverse a trial court's findings of damages unless its findings are against the manifest weight of the evidence." *Fieldcrest Builders, Inc. v. Antonucci*, 311 Ill. App. 3d 597, 607 (1999). Tishman argues the trial court "applied the wrong legal standard" when it began from the "incorrect" legal conclusion that CGA is not responsible for the failure of the USA 4500 system to meet Tishman's requirements, even though it was Tishman that ultimately selected the USA 4500 system specifically and insisted upon its exclusive use for its window wall system. Tishman asserts that it was the "product" that "was clearly the cause of significant delay" and concedes the alleged failure to deliver "the product required by the subcontract" is "decisive" of this issue. We agree that the failure of the product is largely decisive of this issue,

but with a contrary result to the one Tishman advocates. Because the choice of the window wall system and the attendant delays are attributable to Tishman, and because CGA did attempt to deliver the product required by the subcontract, which Tishman rejected because it turned out the product Tishman contracted for was not the product it wanted even though Tishman engaged in extensive discussions using its own knowledgeable representatives about the product before contracting to buy it, Tishman's arguments necessarily fail.

¶ 86 Additionally, Tishman argues that "CGA's failure to deliver shop drawings and test reports on time *** delayed production, and thus installation of the windows." Tishman argues there is no evidence any delays or incomplete or inaccurate shop drawings resulted from anything Meshulam said. Whether Tishman intended this argument to be independent of the argument based on the alleged "inability to deliver the window system in the subcontract"—a proposition we reject—does not matter because, as will be explained below, it fails on its own. Separately, Tishman argues no evidence supports CGA's concurrent delay defense. The trial court found "any delay attributable to window installation prior to the switch to the Wausau system was attributable or concurrently attributable to the system Glass had been directed to install."

¶ 87 According to Tishman's expert, "[a] concurrent delay happens when two individual sets of activities independently delay the completion of the project" and "if it is a concurrent delay, both delays, depending on the party responsible, both delays may be viewed to delay the project equally." *Fru-Con Corp. v. State*, 50 Ill. Ct. Cl. 50, 95 (1996).

¶ 88 Tishman's expert Sieracki testified that no delay that CGA caused was concurrent with any independent delays. He stated there were no concurrent delays. However, he also testified that the window wall system impacted the "critical path" "even though it's not directly impacting

other trade work at that time." Sieracki further admitted he removed control lines and concrete slabs from the critical path when window fabrication and delivery fell behind schedule and those items alone "became the critical path." Sieracki explained this rationale, specifically regarding the windows:

> "They were substantially behind and falling further and further behind, meaning the concrete slabs, which originally were part of the critical path no longer were, they could slip, and that would have no harm on the end date."

¶ 89    As for shop drawings, USA owed CGA shop drawings by December 19, 2014. Indisputably, CGA did not meet that deadline.

¶ 90    The appropriate question for this court is whether there is any evidence in the record to support the trial court's finding. *Antonucci*, 311 Ill. App. 3d at 607, *Aliano v. Sears, Roebuck & Co.*, 2015 IL App (1st) 143367, ¶ 12. We find the facts and reasonable inferences support the conclusion that the delay in providing shop drawings was caused by Tishman's rejection of the USA 4500 window system it selected. As for Tishman's argument that the trial court's finding rejecting the concurrent delay defense has no basis in the record, Tishman relies only on attacking CGA's expert's testimony and bolstering its own expert's testimony to support its conclusion. "[I]n a case of dueling experts, as this one was, it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony." *LAJIM, LLC v. General Electric Co.*, 917 F.3d 933, 946 (7th Cir. 2019). In the face of "conflicting expert testimony *** we will not disturb the trial court's decision in the event it is supported by competent evidence ***." *LaSalle National Bank v. City of Park Ridge*, 74 Ill. App. 3d 647, 662 (1979). Here, the evidence supports the trial court's decision discrediting Sieracki's testimony that absolutely no delays occurred concurrent to any delay CGA may have caused independently

of delays occasioned by the USA 4500 system. There is evidence in the record to support a conclusion that project delays resulted from the failure of the USA 4500 system to meet Tishman's requirements, which cannot be ascribed to CGA; and additional delays were at least concurrent with other, independent delays by CGA. The trial court's judgment is not against the manifest weight of the evidence and is affirmed.

¶ 91                              B. CGA's Cross-Appeal

¶ 92     CGA filed a cross-appeal of the trial court's order excluding testimony concerning its lost profits for the work it was not permitted to perform and its judgment CGA is not entitled to damages for lost profits based on a limitations of damages provision in the contract. In its cross-appeal, CGA does not contest the trial court's judgment as to liability or damages for costs. "When breach of a contract which includes a liquidated damages clause occurs, a question of law arises which must be decided by the court before the provision may be given effect in awarding damages." *M. I. G. Investments, Inc. v. Marsala*, 92 Ill. App. 3d 400, 406 (1981). As it pertains to the issues on appeal article 27 of the contract reads, in pertinent part, as follows:

> "In the event the Agreement is terminated for convenience by Construction Manager, it will pay the lesser of: *** (b) actual costs incurred by Trade Contractor together with a reasonable markup for profit in accordance with the Contract Documents. Upon such a termination Construction Manager will have no further obligation to Trade Contactor nor shall Construction Manager be obligated to pay for (and Trade Contractor hereby waives) any lost profits on Work not performed ***. If Construction Manager terminates this Agreement pursuant to the provision entitled 'Termination for Trade Contactor Default' and it is ultimately decided by a court of law that Trade Contractor has not failed to

comply with any of the provisions of this Agreement or should not have had this Agreement terminated for default, *** such termination shall be treated as a Termination for Convenience pursuant to this Clause and Trade Contractor shall have no further or additional recourse in connection with such termination."

¶ 93     Specifically, CGA argues the trial court erroneously believed that article 27 of the parties' contract applies to its complaint and barred evidence of its lost profits as a matter of law. CGA argues neither is true because although the trial court properly found CGA did not default under the contract and therefore could not be terminated for cause pursuant to the termination for cause provision in article 26 of the contract, the court nonetheless "erred in finding that [CGA's] damages should be limited pursuant to the termination for convenience provision set forth in article 27 of the Trade Agreement." CGA asserts the termination for convenience clause (article 27) applies where the contract is terminated for convenience but in this case Tishman did not terminate for convenience. Instead, Tishman "breached the Trade Agreement." CGA argues that article 27 does not state the parties' intent should Tishman breach, so it is inapplicable and does not bar CGA's ability to recover lost profits.

¶ 94     CGA asserts that in the face of a prior default, Tishman later, in November 2015, pretextually attempted to terminate CGA, which it no longer had any right to do. Tishman responds the parties' contract expressly addresses the situation where it might terminate the contract but later a court decides that termination was wrongful; and under those circumstances, the attempted wrongful termination of the contract is treated as a termination for convenience and article 27 applies. In reply, CGA argues affirmatively that Tishman breached the contract in May 2015 when it required CGA to switch to the Wausau system and at that moment CGA "could either terminate or repudiate the Trade Agreement."

¶ 95    First, we hold CGA did not waive its right to enforce Tishman's breach of its contract by continuing to work on the building project while negotiating a change order for the switch to the Wausau window system.  See *Galesburg Clinic Ass'n v. West*, 302 Ill. App. 3d 1016, 1020 (1999) ("the act relied on to constitute the waiver must be clear, unequivocal and decisive. [Citation.]  The victim of a breach is not required to act immediately upon suspicion of a breach.").  Irrespective of that, CGA further argues article 27 on its face does not address the circumstances here, where "the general contractor defaults before either a termination for cause or a termination for convenience have occurred or been invoked by the general contractor;" article 27 only covers a situation where, as it pertains to this case, the subcontractor does not in fact default but the contractor terminates the contract for default and a court later determines the alleged default leading to the termination did not occur.  In sum, CGA argues that "Tishman's prior default renders none of the provisions of article 27 applicable to the case at bar because Tishman breached the Trade Agreement before it sought to invoke either article 26 termination for cause or article 27 termination for convenience."

¶ 96    Tishman has directed this court to a decision from a foreign jurisdiction involving analogous facts and law as are present here.  While the decisions of foreign jurisdictions are not binding on this court, they can be highly persuasive.  *Midland Funding LLC v. Schellenger*, 2019 IL App (5th) 180202, ¶ 12.  In *Gulf Liquids New River Project, LLC v. Gulsby Engineering, Inc.*, 356 S.W.3d 54 (Court of Appeals of Texas, Houston (1st Dist.) 2011), an owner sued its general contractors for breach of contracts to build multiple "off-gas"[1] refineries.  *Gulsby Engineering,*

---

[1]    "Off-gasses" are waste products from chemical refineries that can be processed into chemicals that can then be sold.  *Gulsby Engineering, Inc.*, 356 S.W.3d at 60.

*Inc.*, 356 S.W.3d at 60. The owner notified the general contractor it was in default and gave it time to cure the default. *Id.* at 61. Subsequently the owner formally terminated the contracts and sued the general contractors. *Id.* at 62. One of the issues in the appeal was whether the owner breached the contracts because terminating the contracts "was both proper and reasonable in light of the termination clauses in the contracts." *Id.* at 65.

¶ 97     In that case, like this one, a "termination clause provided that if [the owner] *wrongfully* terminated [the contractor] for cause, such termination 'shall be deemed a termination without cause [(or a termination for convenience)]." *Gulsby Engineering, Inc.*, 356 S.W.3d at 65. There, like here, in the event of a termination for convenience the general contractor's "sole and exclusive remedy" was payment for the percentage of work actually completed plus overhead and profit on actual costs to date. *Id.*

¶ 98     In *Gulsby Engineering, Inc.*, like here, the general contractor argued that because the owner "breached the contract it cannot rely on the termination-for-convenience clause to limit its damages." *Gulsby Engineering, Inc.*, 356 S.W.3d at 66. The Texas court noted that none of the general contractor's authorities "addresses the issue of whether the breach of contract by an owner results in the forfeiture of contractual provisions that would limit the [owner's] remedies." *Id.* at 68. The [owner] argued, and the court agreed, that refusing to enforce the limitations-of-damages provision in the contract would "render the termination-for-convenience clause meaningless." *Id.* The court reasoned,

"The clause expressly contemplates that if Gulf Liquids wrongfully terminates Gulsby, the termination will be deemed a termination without cause, and limits Gulsby's damages accordingly. Such a clause would never be enforceable if by wrongfully terminating, the owner also loses the right to

exercise the termination-for-convenience clause and the limitation-of-damages

provision found therein." *Id.*

The court held that it would

"not render that provision meaningless by holding that the owner's rights are

waived by committing the very breach that the clause contemplates. Such circular

reasoning would render the termination-for-convenience clause meaningless. ***

As such, we conclude that [the contactor's] right to recover damages *** was

limited to the amounts specified in the termination-for-convenience clause." *Id.*

¶ 99      As stated above the Texas court's rationale is sound and consistent with federal

jurisprudence surrounding termination for convenience clauses. We choose to adopt its

reasoning. Accordingly, we hold the trial court in this case properly held that article 27 controls

CGA's damages for Tishman's wrongful termination of the parties' contract. Notably, however,

the Texas court went on to hold that "any pre-termination claims that the contractor was owed

more money *** are preserved." *Id.*

¶ 100   In Illinois, courts have found a separate cause of action for "breach of implied warranty

of accuracy and sufficiency of its plans and specifications." See *W.H. Lyman Construction Co.*

*v. Village of Gurnee*, 84 Ill. App. 3d 28, 34-35 (1980). In this case, the trial court entered a

judgment on CGA's breach of contract claim and Tishman's amended counterclaims in count I

for breach of contract, count II for anticipatory repudiation, count III for indemnification, and, in

a supplemental judgment order, count IV of the amended counterclaim for fraud. Count I of

CGA's third amended complaint for breach of contract alleged Tishman breached the parties'

contract in the following way:

"(h)     Failing to effectively communicate with the architect, the professional

engineers, the expert consultants to provide CHRISTOPHER GLASS with the

necessary design criteria, specifications, and drawings which were necessary for

CHRISTOPHER GLASS to perform under the Trade Contract."

¶ 101   The trial court's judgment in this case does not specify which subparagraph or

subparagraphs it entered judgment on.  The trial court entered judgment on CGA's "Third

Amended Complaint for Breach of Contract" without further elucidation of what it was actually

deciding.  Reading the trial court's judgment as a whole, in light of CGA's complaint, on the one

hand it is possible to conclude the trial court found only that because Tishman provided the

"plans and specifications" (selecting the USA 4500 system and mandating its exclusive use)

CGA cannot be held liable for any losses suffered from trying to comply with the contract's

terms.  In other words, the court held CGA can use *Spearin* as a shield against liability.  But see

*Penzel Construction Co., Inc. v. Jackson R-2 School Dist.*, 544 S.W.3d 214, 226 (Mo. Ct. App.

2017) ("*Spearin* is not merely a shield to protect the contractor from liability; it can also be used

to compensate a wronged contractor."  See *Essex Electro Engineers, Inc. v. Danzig*, 224 F.3d

1283, 1289 (quoting *Chaney & James Construction Co. v. United States*, 421 F.2d 728, 732 (Ct.

Cl. 1970) ("[A]ll delay due to defective or erroneous Government specifications are *per se*

unreasonable and hence compensable.")).

¶ 102   On the other hand, subparagraph (h) of CGA's third amended complaint for breach of

contract states a claim for breach of the implied warranty of accuracy and sufficiency of the

plans and specifications; or in other words, the *Spearin* "sword."  See *W.H. Lyman, Construction*

*Co.*, 84 Ill. App. 3d at 39 (finding complaint stated a cause of action for breach of implied

warranty of the accuracy and sufficiency of the plans and specifications).

1-19-1972)
1-19-2038)Cons.

¶ 103   The trial court found that article 27 provided "the only method of recovery" because Tishman could not default CGA for cause.  ("The court finds that [CGA] did not default under the terms of the Trade Agreement.  Any delay before the switch in the window system was due to Tishman's errors and omission.")  However, CGA also stated a claim that Tishman breached the contract's implied warranty of accuracy and sufficiency, and there is sufficient evidence in the record that the trial court may have agreed and intended to so hold, even if it did not do so explicitly (or with enough plainness for us to grasp it).  The distinction is important, because there is no finding, nor do we express an opinion, as to whether article 27 also limits CGA's damages for Tishman's' breach of the warranty of accuracy and sufficiency, should there be any such breach.

¶ 104   We reject Tishman's argument "the material breach to which CGA" refers is "the alleged wrongful termination itself."  CGA asserts Tishman's' breach was the selection of a window system that could not perform to specifications and the trial court's judgment as a whole at least suggests the court found that breach occurred.  The only open question would be CGA's damages stemming from that breach.  However, we also reject CGA's argument that "Tishman's prior default renders *none* of the provisions of article 27 applicable to the case at bar because Tishman breached the Trade Agreement before it sought to invoke either article 26 termination for cause or article 27 termination for convenience."  CGA can recover damages, if any, for Tishman's breach of the implied warranty of accuracy and sufficiency up to the time of Tishman's termination of the contract.  See *supra* ¶ 126.

¶ 105   We will not speculate as to the trial court's intent concerning its judgment; the better practice is to remand to the trial court to clarify its meaning by entering any judgments it intended and to conduct further proceedings as may be required.  See generally *Schwehr v.*

- 44 -

*Badalamenti*, 14 Ill. App. 2d 128, 136 (1957), quoting *Gago v. People*, 163 Ill. 39, 40 (1896) ("It has been held a number of times that, where the error did not occur during the course of the trial, but only after its conclusion, a new trial will not be ordered, the reversal will only go to the point where the error occurred, so that it may be corrected."), *McNulta v. Ensch*, 134 Ill. 46, 56 (1890) (relied upon by *Robinson v. Steward*, 252 Ill. App. 203, 211 (1929)); but see *Bashum v. Hunt*, 332 Ill. App. 3d 980, 992 n3 (2002) ("Appellate court cases decided prior to 1935 are not binding authority and have no precedential value.").

¶ 106   For the foregoing reasons, the trial court's judgment as to damages only is vacated, and the cause is remanded for further proceedings not inconsistent with this order.  Specifically, on remand the trial court is instructed to clarify its judgment as to CGA's breach of contract claim and, specifically, whether Tishman breached subparagraph 266(h) of count I, and to conduct any further proceedings necessitated by its ruling as to damages for breach of implied warranty of accuracy and sufficiency.  The parties are not precluded from raising any arguments in support of or in opposition to the aforementioned considerations.

¶ 107                                        CONCLUSION

¶ 108   For the foregoing reasons, the circuit court of Cook County is affirmed in part and vacated in part and the cause is remanded with instructions.

¶ 109   Affirmed in part, vacated in part, and remanded with instructions.